ANNA McCRINK, as Administratrix of the Estate of FRANCIS J. McCRINK, Deceased, et al., Appellants, *v.* CITY OF NEW YORK, Respondent.

Argued October 16, 1946; decided January 16, 1947.

*I. Maurice Wormser, Samuel L. Sargent, Isidor Blum* and *Herman C. Angstreich* for appellants. I. The decision of the Appellate Division is based on erroneous premises and reasoning. (*Dickson* v. *McCoy,* 39 N. Y. 400.) II. The city is liable because the police commissioner was negligent in retaining the police officer on the police force when he knew that such officer was not fit to be on the force or to be armed with a revolver. (*People ex rel. Campbell* v. *Partridge,* 99 App. Div. 410, 180 N. Y. 542; *Matter of Greenebaum* v. *Bingham,* 201 N. Y. 343; *Matter of Shea* v. *Valentine,* 249 App. Div. 556; *Thomas* v. *Winchester,* 6 N. Y. 397; *Brown* v. *Rosen,* 256 N. Y. 576; *Hall* v. *Smathers,* 240 N. Y. 486; *Cusack* v. *Ottinger,* 245 N. Y. 595; *Gilrane* v. *Christine,* 230 App. Div. 787; *Gerbino* v. *Greenhut-Siegel-Cooper Co.,* 165 App. Div. 763; *Kuchlik* v. *Feuer,* 239 App. Div. 338, 264 N. Y. 542; *Golembe* v. *Blumberg,* 262 App. Div. 759; *Ford* v. *Grand Union Co.,* 268 N. Y. 243; *Perrotta* v. *Picciano,* 186 App. Div. 781; *Baird* v. *N. Y. C. & H. R. R. R. Co.,* 64 App. Div. 14, 172 N. Y. 637; *Matter of Sabbatino & Co., Inc.,* 150 F. 2d 101.) III. If reasonable care and diligence had been exercised, the commissioner would have known the full extent of the officer's mental derangement. (*People ex rel. Morrissey* v. *Waldo,* 212 N. Y. 174; *Laning* v.

*N. Y. C. R. R. Co.*, 49 N. Y. 521; *Baulec* v. *New York & Harlem R. R. Co.*, 59 N. Y. 356; *Wall* v. *Delaware, L. & W. R. R. Co.*, 54 Hun 454, 125 N. Y. 727.) IV. Even apart from the negligence of the commissioner in keeping the officer on the police force and armed with a revolver, the city is liable for his shooting of the two men. (*Pollard* v. *Trivia Building Corp.*, 291 N. Y. 19; *Chapman* v. *New York Central R. R. Co.*, 33 N. Y. 369; *Egan* v. *State of New York*, 255 App. Div. 825; *Nephew* v. *State of New York*, 178 Misc. 824; *Higgins* v. *Watervliet Turnpike Co.*, 46 N. Y. 23.) V. The city is not immune from liability in these actions. (*Augustine* v. *Town of Brant*, 249 N. Y. 198; *Jackson* v. *State of New York*, 261 N. Y. 134; *Matter of Evans* v. *Berry*, 262 N. Y. 61; *Bernardine* v. *City of New York*, 294 N. Y. 361; *Steitz* v. *City of Beacon*, 295 N. Y. 51; *People ex rel. Morrissey* v. *Waldo*, 212 N. Y. 174; *Matter of Klinkenberg* v. *Valentine*, 256 App. Div. 638; *Matter of Shea* v. *Valentine*, 249 App. Div. 556.)

*John J. Bennett, Corporation Counsel (Fred Iscol, Seymour B. Quel* and *James E. O'Reilly* of counsel), for respondent. I. There was no evidence from which a jury could properly find that the city, through its officers and employees, knew or had reasonable cause to believe that the police officer was a chronic alcoholic or a man of vicious propensities. (*People ex rel. Klesitz* v. *Mills*, 179 Misc. 58; *Boschen* v. *Stockwell*, 224 N. Y. 356; *Matter of Long*, 261 App. Div. 456, 287 N. Y. 449; *Ford* v. *Grand Union Co.*, 268 N. Y. 243; *Fletcher* v. *Baltimore & Potomac Railroad*, 168 U. S. 135; *Hogle* v. *Franklin Mfg. Co.*, 199 N. Y. 388; *Swinarton* v. *LeBoutillier*, 7 Misc. 639, 148 N. Y. 752; *Hall* v. *Smathers*, 240 N. Y. 486; *Cusack* v. *Ottinger*, 245 N. Y. 595; *Rafsky* v. *City of New York*, 257 App. Div. 855; *Abbott* v. *New York Public Library*, 263 App. Div. 314; *Matter of Sabbatino & Co.*, 150 F. 2d 101; *Osipoff* v. *City of New York*, 286 N. Y. 422; *Nephew* v. *State of New York*, 178 Misc. 824.) II. The power to dismiss or retire a policeman is vested by statute in the police commissioner and the Board of Trustees of the Police Department. The City of New York cannot be held for their failure to act or for an alleged improvident exercise of their discretion. (*Matter of Budd* v. *Valentine*, 283 N. Y. 508; *People ex rel. Kasschau* v. *Police Comrs.*, 155

N. Y. 40; *People ex rel. Guiney* v. *Valentine,* 274 N. Y. 331; *People ex rel. Regan* v. *Enright,* 240 N. Y. 194; *Steitz* v. *City of Beacon,* 295 N. Y. 51; *Murrain* v. *Wilson Line,* 270 App. Div. 372.)

LEWIS, J. At an early morning hour of January 3, 1943, Harry Anderson, a New York City police patrolman, while off duty and concededly intoxicated, shot and killed Francis McCrink and seriously wounded the plaintiff, Sidney Murphy. The assault by Anderson, which was unprovoked, gave rise to two actions at law against the City of New York — one by the estate of Francis McCrink for damages resulting from his death, and one by Sydney Murphy for damages due to personal injuries he sustained. The two actions were consolidated at Trial Term where, based upon a jury's award to each plaintiff, a single judgment was entered in their favor. At the Appellate Division that judgment was reversed on the law and the facts and each complaint was dismissed on the law. The case comes to us upon appeal by the plaintiffs as of right.

The assault occurred in the following circumstances: The decedent and Murphy, who had been together during the previous evening of January 2d, were homeward bound and were standing in conversation near the intersection of Fourth Avenue and 87th Street in Brooklyn when they saw Anderson in civilian clothes walking toward them. He was obviously intoxicated. Neither the decedent nor Murphy was acquainted with Anderson although Murphy knew him to be a patrolman who lived in their immediate neighborhood on 87th Street. As Anderson approached the two men he cursed them and asked why they were standing there. It is Murphy's testimony that " We told him to go home, that he didn't know us." At that moment a friend joined the group and invited the decedent and Murphy into a restaurant. As the three men left Anderson he turned and was seen walking toward his home on 87th Street. Fifteen minutes later the decedent and Murphy came out from the restaurant and walked across 87th Street where they stood for a brief time. While they were in conversation they heard Anderson addressing them in abusive language from the point where he stood in front of his home " six or seven houses " away. The two men again " told him to go home " and started toward Fourth

Avenue " just to get away from him ". As they walked away Anderson fired from a revolver the two shots which brought death to the decedent and permanent injury to Murphy.

Immediately after the shooting Anderson was taken to a precinct station where a police surgeon pronounced him " intoxicated ". He was confined in jail from that date until March 13, 1943, when he was removed to the Kings County Hospital where, on May 5, 1943, upon a court order (Code Crim. Pro., § 658) his mental condition was diagnosed as " Psychosis due to alcohol. Paranoid deterioration type." That condition, according to testimony by one of the examining physicians — introduced by the plaintiffs without objection — was caused by " His excessive indulgence in alcohol over a number of years ". It " * * * resulted in development of psychosis, characterized emotional, intellectual deterioration and delusions." The record also shows that on May 19, 1943 — less than five months after the assault — he was " Dropped from the rolls of the Police Department; he having been committed to the Matteawan State Hospital for the insane ".

The breach of duty by the city which the plaintiffs pleaded and the theory upon which the case was tried was that the city negligently failed to discharge Anderson when it knew, or in the exercise of reasonable care should have known, that he was an incompetent, troublesome and vicious person who had become so addicted to an excessive use of alcohol that he had repeatedly been the subject of disciplinary action; and that, with knowledge of Anderson's vicious propensities the city knew or should have known that his compliance with rule 288 of the Rules and Regulations of the Police Department — which required him as a patrolman to carry a revolver " at all times " — was a source of danger to the public.

Upon its review of the record now before us the Appellate Division has ruled as a matter of law that — " The facts are insufficient upon which to predicate the conclusion that defendant should have anticipated the assaults perpetrated by Anderson, even though four months after the occurrence, and on May 5, 1943, Anderson was diagnosed as a ' Paranoid deterioration type ' with a ' Psychosis due to alcohol '." (270 App. Div. 1019.)

Our examination of the record leads us to a contrary conclusion which is confirmed by evidence of disciplinary proceedings against Anderson which were matters of formal record in the Police Department and were before the Police Commissioner who admitted they were "thoroughly examined" by him on those occasions when Anderson was before him charged with misbehavior. There is evidence that in October, 1928, Anderson was found guilty of being intoxicated while off duty and was fined and placed on probation for six months. In 1936, when he was again found guilty of being intoxicated, his record was marked "bad" and he was fined and placed on probation for a year under the supervision of his commanding officer and a police chaplain. When that disciplinary action was taken the commissioner warned Anderson — "If you get in any trouble while you are on probation, you are out. * * * If you don't want the job, just get into any kind of trouble, and you will be dismissed." Then came an occasion in 1937 when his intoxication again led to disciplinary proceedings and again he was brought before the commissioner. On that occasion the following colloquy between the commissioner and Anderson reveals, as we view it, not only knowledge by the official head of the defendant's Police Department that Anderson was irresponsible and could not be depended upon to abstain from an excessive use of alcohol but — more important to our present problem — it is proof from which a jury might find that the commissioner was fully aware that he was not to be trusted to perform the duties of a patrolman: "Q. [by the commissioner] — Now, you are in again on an intox — while on duty, in uniform, drunk, and this is your third intox. You know what happens on a third intox, don't you? A. Well, I would like you to give me another chance. Q. I know that, but I say, *you know what happens on a third intox. You know what usually happens on the second, and always happens on the third.* A. I don't know just what to say, sir, I am just excited at present, Commissioner. I get excited on those things. * * * Won't you give me another chance, probation, Commissioner? Q. No, you don't get another chance. You have had all the chances you are entitled to. Step out."

For reasons unexplained in the record the commissioner appears to have reconsidered his decision. Upon recalling

Anderson to the hearing their colloquy continued: " Q. [by the commissioner] I have got your dismissal papers all signed. * * * *You don't merit any consideration. Three intoxes.* The first one is off duty, in civilian clothes, the second, off duty, in uniform, and the third one is on duty, in uniform. You have already finished up a year on probation. * * * You are here on your own. We treat you exactly as we find you. We don't care anything about who you know, and in addition to being here on your own, we have your record since you came in the Department, and that is what determines whether you are going to stay in the Department, or whether you are going to be dismissed, *your conduct plus your record, and your record doesn't warrant, or justify anybody placing any confidence in you.* You were here before and I asked you what probation meant. Do you remember what you told me? A. Well, Commissioner, probation — please give me one more° chance. * * * Q. All right, you are on probation for one year from today. Do you understand? A. Yes, sir. Q. What does it mean? A. It means to keep out of trouble or I will — I am finished."

When the italicized portions of the commissioner's statements quoted above are considered with his admission in this case that a revolver in the hands of a drunken person is fraught with potential danger, and with his further testimony that " * * * a patrolman, in our Department is required to carry a revolver at all times, even if he goes to church. On or off duty ", we cannot say there is no evidence from which a jury might find that his retention in police service as a patrolman involved potential danger to others.

True it is — as urged by the city — that the statutory authority given to the Police Commissioner, as the chief executive officer of the Police Department, to dismiss a member of the police force, calls for the exercise of his discretion. (New York City Charter, §§ 431, 434; Administrative Code, § 434a–14.0.) But the Legislature in legal effect has limited the scope of that discretion by the enactment of section 8 of the Court of Claims Act which waives the State's sovereign immunity from suit and consents to have its liability determined " * * * in accordance with the same rules of law as applied to actions in the supreme court against individuals or corporations

\* \* \* ''. The immunity thus waived and the consent thus granted apply to the ''\* \* \* civil divisions of the State [which] are answerable equally with individuals and private corporations for wrongs of officers and employees,— even if no separate statute sanctions that enlarged liability in a given instance.'' (*Bernardine* v. *City of New York*, 294 N. Y. 361, 365.) It follows that where, in circumstances such as those we are now considering, the retention of an employee may involve a known risk of bodily harm to others, the field in which that discretion may be exercised by the head of a department is limited. It is superseded by the duty to abate that risk if in related circumstances danger to others is reasonably to be perceived. (*Palsgraf* v. *Long Island R. R. Co.*, 248 N. Y. 339, 344.) Otherwise a discretion as broad as that claimed by the city in this instance for the head of a department would often serve to restore without legislative action the immunity from suit which the Legislature has waived by the enactment of section 8 of the Court of Claims Act. That waiver having been effective to make the defendant city liable as is an individual or corporation for wrongful acts of its officers and agents (*Bernardine* v. *City of New York, supra,* p. 365), it may not with impunity retain in service an employee from whose retention danger to others may reasonably be anticipated. (*Fletcher* v. *Baltimore & Potomac Railroad,* 168 U. S. 135, 140; *Hall* v. *Smathers,* 240 N. Y. 486, 490–491; *Cusack* v. *Ottinger,* 245 N. Y. 595; *Wall* v. *D. L. & W. R. R. Co.*, 54 Hun 454, 458, affd. 125 N. Y. 727; *Baulec* v. *New York & Harlem R. R. Co.*, 59 N. Y. 356, 360–361; *Matter of Sabbatino & Co.*, 150 F. 2d 101, 105; and see Restatement, Torts, §§ 317, 390.)

Where, as in the case at hand, '' \* \* \* mere potentiality of injury exists, only such foresight as appears to be commensurate with its reasonably probable occurrence need be employed.'' (*Van Leet* v. *Kilmer,* 252 N. Y. 454, 457.) We think it was a question of fact for the jury whether, in the circumstances disclosed by this record, the retention in police service of patrolman Anderson involved danger to others reasonably to be foreseen.

The judgments should be reversed and a new trial granted, with costs to abide the event.

THACHER, J. (dissenting). Upon careful study of the record in this case I am confirmed in the view that the Appellate Division was right in concluding that the facts were insufficient to support the conclusion that the defendant should have anticipated, on December 11, 1937, the assaults perpetrated by Anderson on January 2, 1943.

It is important to bear in mind the sequence of the only events disclosed by the record which show knowledge by his superiors of indulgence in alcohol by Anderson prior to the time when it is claimed that Commissioner Valentine was negligent in not dismissing him from the force in December, 1937. The first of these occurred on October 27, 1928, during prohibition days. While off duty and in civilian clothes, Anderson was intoxicated and unfit for police duty. This incident was not proof of any vicious or insane tendencies. He was placed upon probation for six months from December 1, 1928, by direction of the then Police Commissioner and restored to duty on June 4, 1929, his record having been clear while on probation. Nothing of the kind happened again until March 17, 1936, when he was intoxicated, off duty and in uniform. Again he was placed on probation for one year, with the warning that any kind of trouble while on probation would result in dismissal. The reports from his commanding officer and chaplain were that his conduct was satisfactory during the period of probation. The last incident before the final unfortunate and fatal occurrence on January 2, 1943, was on November 18, 1937. Anderson failed to report for assignment at 1 P.M. as directed, and when found at 1:20 P.M. was intoxicated and unfit for duty. He was again interviewed by the Police Commissioner, who, contrary to the usual rule, gave him another chance and again placed him upon probation for a year. There were no charges against Anderson during this period of probation nor any charges indicating indulgence in alcoholic beverages during the entire period of five years preceding the fatal shooting on January 2, 1943.

This is the record upon which the action of the Police Commissioner on December 11, 1937, in putting Anderson on probation for another year instead of dismissing him from the force, must be judged, and I can find in it no evidence upon which the jury could have predicated its finding that when this was done there was reason to anticipate the shooting which occurred over

five years later. I believe the court has given undue weight to the psychiatric examination and the diagnosis of chronic alcoholism made in the hospital several months after the shooting occurred. Certainly that is no evidence that the defendant knew, or should have known, that the man was a chronic alcoholic with paranoidal tendencies five years before the condition was discovered. The testimony of the doctor who made the diagnosis is in my judgment of importance only to show that the shooting occurred as a result of insanity which could not have been anticipated by the commissioner. Nor do I think the commissioner was bound to give weight to the hearsay statement made by an unknown complainant that " on Prospect Avenue there was a drunken officer with a gun ". Taken at face value the statement was true, but there was no evidence that he had the gun in his hand or that he was threatening to use it; on the contrary, the testimony of the officer who went to the scene when the complaint was made was that he had no gun in his hand when he observed him. The record before the commissioner showed long periods of good behavior and nothing in my judgment sufficient to show that he should have anticipated the acts of a madman which occurred on January 2, 1943. I cannot agree that the commissioner may not in the exercise of an honest discretion retain a man on the force who in a period of nine years had been intoxicated on two prior occasions, or that the city is liable for the consequences of the shooting five years thereafter, when the man was not merely intoxicated but out of his mind.

I dissent and vote for affirmance.

LOUGHRAN, Ch. J., CONWAY, DESMOND, DYE and FULD, JJ., concur with LEWIS, J.; THACHER, J., dissents in opinion.

Judgments reversed, etc.