YVONNE HADDOCK, Appellant, v CITY OF NEW YORK, Respondent.

First Department, September 8, 1988

### APPEARANCES OF COUNSEL

*Joseph Kelner* of counsel *(Kelner & Kelner,* attorneys), for appellant.

*Dana Martine Robbins* of counsel *(Larry A. Sonnenshein* with her on the brief; *Peter L. Zimroth, Corporation Counsel,* attorney), for defendant-respondent.

**OPINION OF THE COURT**

ELLERIN, J.

This action was brought to recover damages for traumatic injuries suffered by plaintiff when, as a nine-year-old child, she was repeatedly raped and terrorized by a New York City Parks Department utility worker. The basis asserted for the City of New York's liability is that despite having knowledge of the worker's extensive history of violent and recidivist criminal activity, including convictions for rape offenses, the city negligently retained him to work, almost totally unsupervised, at the children's playground where the rape occurred. A prior judgment in favor of the infant plaintiff in the sum of $2,500,000 was reversed by this court, and a new trial directed, by reason of an error in the charge. The instant appeal is from the retrial.

Plaintiff Yvonne Haddock was nine years old on April 8, 1975 when, after school, she went to the Parkside Playground in the Pelham Bay section of The Bronx near her home together with her sister and four other children. She normally visited this playground 3 or 4 times a week and knew James Johnson as the Parks Department worker in charge of the playground who would pick up garbage and hand out basketballs. On the day in question, Johnson gave Yvonne a jump rope and told her to return it to him when she had finished playing with it. At about 5:00 P.M., when Yvonne went to the maintenance shed to return the jump rope, Johnson closed and blocked the door of the shed with a desk, and for more than 2½ hours thereafter subjected the child to a series of violent and brutal rapes accompanied by repeated threats to kill her. When she was finally able to get away, Yvonne, who was in tears and bore obvious physical indicia of her ordeal, ran home and reported the occurrence to her mother. The police were immediately notified and Yvonne was taken to Misericordia Hospital where she was treated for her physical injuries. Subsequently, she also received extensive psychiatric treatment and suffered marked personality changes which have affected her ability to relate to people, particularly those of the opposite gender, and the medical testimony indicated that she will require psychiatric treatment for the rest of her life.

Johnson was apprehended by the police several days after the incident occurred and was ultimately convicted of this crime. He was sentenced to a lengthy prison term after a trial

in Supreme Court, Bronx County, at which Yvonne was required to testify.

Johnson was a career criminal who had been hired by the City of New York for this job in 1974 shortly after his release from a prison term for violating parole on a rape charge. His hiring was pursuant to the Work Relief Employment Program (WREP) designed to provide employment opportunities and job training for welfare home relief recipients, including those with a criminal background. Johnson was fingerprinted in connection with his job application, and after some delay, during which time he had already commenced employment, the prints and the arrest record were sent to the New York City Department of Personnel. This report revealed that Johnson had an arrest record dating back to 1938, when he was a teen-ager, and that in 1946 he had been charged, in Queens County, with rape, robbery, and felonious assault, and was convicted of attempted rape, robbery in the second degree, and grand larceny in the first degree, for which he received a sentence of 15 to 30 years. Upon his parole in December 1967, he was almost immediately rearrested on charges of rape and other violent crimes. These charges served as the basis for revocation of Johnson's parole and he was returned to jail where he remained incarcerated until 1974 when his release was mandated by expiration of his sentence.

Despite this background of violent criminal behavior, Johnson was assigned to work at the children's playground, generally alone and unsupervised. Most disturbing is the fact that the City Department of Personnel, upon receiving actual notice of his complete criminal record, never took any steps either to reevaluate Johnson or to transfer him to another job where he would not be alone in contact with young children.

The law is well settled that an employer has a duty to use reasonable care and refrain from knowingly retaining in its employ a person with known dangerous propensities in a position that would present a foreseeable risk of harm to others. This rule is no less enforceable when the employer is the government. "[The city] may not with impunity retain in service an employee from whose retention danger to others may reasonably be anticipated." *(McCrink v City of New York,* 296 NY 99, 106.)

In *McCrink (supra),* an off-duty New York City police officer, while intoxicated, shot and killed one citizen and seriously wounded another. In three separate disciplinary proceedings

prior to the incident, he was found guilty of intoxication and punished for the offense. However, the city retained the police officer in its employ despite the fact that his retention as a police officer, who was required to carry a revolver at all times, posed a potential danger to the public. The Court of Appeals held that this disciplinary record was proof from which a jury might find that the police department was fully aware that the officer was not to be trusted to perform the duties of a police officer and that it could be found negligent for retaining him. The court set forth the rule that when the retention of an employee may involve a risk of bodily harm to others, the discretion of the government is limited and superseded by the duty to abate the risk of dangers to others *(supra,* 296 NY, at 106). Whether in the particular circumstances of any particular case the danger to others could reasonably be foreseen is a question of fact for the jury.

■ In this case the risk must further be evaluated in the context of the specific duty which defendant city owed to plaintiff as a child invited to use the playground. The city had an obligation to maintain that playground in a reasonably safe condition for the use of children such as plaintiff. That duty went beyond the mere maintenance of the physical condition of the park and included the obligation to protect those children against known or foreseeable dangers which might arise through the activities of others. *(See, Caldwell v Village of Is. Park,* 304 NY 268; *Noreck v Fronczak,* 294 NY 751; *Collentine v City of New York,* 279 NY 119.)

On this record, the Trial Judge improperly granted defendant's motion to set aside the verdict and dismiss the complaint. There was ample evidence here to support the jury's finding in favor of plaintiff against the city. The city's continued assignment of Johnson to a largely unsupervised position in a public playground where children were invited to play, after receiving actual knowledge of Johnson's alarming history of violent criminal activity, subjected those children to a clearly foreseeable risk of harm and constituted actionable negligence.

■ This case does not, as the trial court mistakenly assumed, involve the concept of a "special duty" which must exist between the government and a particular citizen before tort liability can be imposed on the government for failure to provide adequate police protection *(e.g., Schuster v City of New York,* 5 NY2d 75). Here plaintiff is not complaining of a general failure to provide police protection, but is rather

alleging the negligent retention of a dangerous employee in a position at the playground presenting a foreseeable risk of harm to children invited to use the playground.

Equally untenable is the trial court's reliance on the principles enunciated in *Weiss v Fote* (7 NY2d 579) which invests the government with immunity from tort liability for discretionary determinations in the administration of government planning bodies. But such is not the nature of the determination here in issue and that doctrine has no application to a situation involving the negligent retention of a particular public employee *(McCrink v City of New York, supra)* and the violation of the duty owed to the infant user of a public playground.

■ Similarly irrelevant is the trial court's discussion of the issues of whether Johnson was acting in the scope of his employment when he attacked the plaintiff, or whether the rape was an intervening and superseding cause breaking the chain of causation. The doctrine of respondeat superior has no relevance in this case where the sole issue is whether the city itself was negligent. Whether the violent assault was a foreseeable consequence of the city's negligent retention of Johnson was an issue to be resolved by the jury and there was ample evidence to support its finding that the attack was not a superseding cause.

■ The trial court also invoked public policy considerations favoring the gainful employment of exconvicts to foster their rehabilitation, and concluded that the upholding of this jury verdict would deter the city's employment of former criminals. This case calls for no such conclusion. We merely hold, in accordance with well-settled principles of law, that an employer must conduct a reasonable inquiry in evaluating an employee's past criminal record and may not negligently assign a former convict with a violent history to an unsupervised sensitive position where there is a foreseeable danger to others.

This obligation has not been diminished by the decision in *Eiseman v State of New York* (70 NY2d 175), heavily relied upon by the defendant city in support of its contention that it was free to hire a paroled felon without fear of liability for his acts and that it had no duty to restrict his activities once it hired him. That is not, however, the import of the *Eiseman* case.

In *Eiseman (supra),* following his release from prison, a

paroled felon with a history of mental disorders attended a State college under a government program of educational opportunities for the disadvantaged (SEEK). While at the college, he developed a friendship with a fellow student, Rhona Eiseman, and her roommates, who shared an off-campus apartment. One night at this off-campus apartment the parolee raped and murdered Ms. Eiseman, murdered one roommate and stabbed another, inflicting serious injuries.

The Court of Appeals reversed a judgment against the State in favor of Eiseman's estate and dismissed the claim. The court noted that the State could not be liable for injuries inflicted by a paroled convict merely by virtue of his release or supervision on parole. In the instant case, however, plaintiff Haddock asserts liability against the city not because the crime was committed by a released inmate, but because it was committed by a city employee retained in a sensitive position despite the employer's actual knowledge of his record of rape and violence.

In *Eiseman,* moreover, the primary focus was on (1) whether a prison doctor who completed a medical form regarding Campbell's health history did so inaccurately (which the court found not to be the case) coupled with a discussion of the "uncharted waters of the legal consequences of a physician's inaccurate responses to a health report—particularly the novel question whether his duty ran beyond the school, to students individually" *(supra,* 70 NY2d, at 185) and (2) whether by participating in the SEEK program the college undertook either a duty of heightened inquiry in admissions, or a duty to restrict Campbell's activity on campus, for the protection of other students.

While the Court of Appeals made a policy decision not to expand existing duties to extent to either of these situations, it also made clear that its decision in this regard did not affect cases where a legal duty already exists by virtue of a special relationship with a student, or cases, such as *Miller v State of New York* (62 NY2d 506) where liability was imposed for failure to maintain school premises. *(Eiseman v State of New York, supra,* at 190, n 3.) In the instant case, no novel or previously undefined duties are at issue. Here, we are dealing with well-recognized legal duties imposed upon the city both with respect to the negligent retention of an employee who poses a danger to others and the protection of children who are invited to use its playgrounds.

Contrary to the defendant's assertions, the broad language in *Eiseman (supra)*, discoursive of the public policy considerations favoring the gainful education and employment of exconvicts, is not inconsistent with a judgment in favor of this plaintiff. Our holding here does not require the city, in employing a paroled felon, to publicly brand him as an exconvict or otherwise unreasonably restrict his activities. Nor does it militate against the gainful employment of paroled prisoners in appropriate positions where they do not pose a foreseeable risk of danger to others. We do, however, hold that the city has a duty not to continue the assignment of an employee to a sensitive, mainly unsupervised position in a children's playground after it learns of that employee's violent criminal history.

While the jury's verdict in favor of the plaintiff should be reinstated based on the record, we find the award of damages to be excessive and reduce the amount of damages to $2,500,000.

Accordingly, the judgment, Supreme Court, Bronx County (Hansel McGee, J.), entered May 20, 1987, which dismissed the complaint and set aside the jury's verdict in plaintiff's favor in the amount of $3,500,000 should be reversed, without costs, on the law and the facts, and the jury's verdict in plaintiff's favor reinstated, and a new trial ordered on the issue of damages unless plaintiff consents to reduce the verdict to $2,500,000.

KUPFERMAN, J. P., CARRO, KASSAL and ROSENBERGER, JJ., concur.

Order and judgment, Supreme Court, Bronx County, entered on April 8 and May 20, 1987, respectively, unanimously reversed, without costs and without disbursements, on the law and the facts, and the jury's verdict in plaintiff's favor reinstated, and a new trial ordered on the issue of damages unless plaintiff consents to reduce the verdict to $2,500,000.