*480 OPINION OF THE COURT
Kaye, J.
 This appeal, centering on the rape of a nine-year-old child in a New York City playground by a Parks Department employee with a history of violent crime, poses a modern-day dilemma: assuring the public safety as well as the rehabilitation of former felons to constructive lives within society. In this case we conclude that the City was properly held liable for the child’s injuries, and therefore affirm the Appellate Division order, but on narrower grounds.
After school on April 8, 1975, plaintiff, her sister and four other children went to The Bronx playground near her home. She usually played there several times a week, and knew James Johnson, then 55 years old, as the only Parks Department employee there. According to plaintiff and her mother, Johnson swept, picked up the garbage, and handed out the games, ropes and basketballs. On the day in question, Johnson gave plaintiff a jump rope and told her to return it to him when she finished with it. At about 5:00 p.m., when plaintiff went into the maintenance shed to return the rope, Johnson closed the door, blocked it with a desk, and for more than two hours repeatedly raped, assaulted and sexually abused the child while threatening to kill her. When Johnson finally allowed her to leave, she ran home and reported the incident to her mother, who took her to Misericordia Hospital where she was treated for her injuries. Johnson was ultimately convicted and sentenced to a lengthy prison term.
*481 Johnson had begun work for the City barely seven months earlier — on September 14, 1974 — pursuant to the Work Relief Employment Program (WREP). Created by the Legislature in 1971 as part of a welfare reform package, WREP was designed to put employable home relief recipients — including ex-convicts — to work in public and private nonprofit agencies, so that they might "work off” their public assistance benefits and also receive training for ultimate self-sufficiency and an escape from what one witness characterized as the "welfare syndrome.” This program replaced prior statutory law allowing local welfare officials to prescribe employment, with a mandate requiring that they assign work to employable home relief recipients, and it permitted only limited local discretion to declare individuals unable to work (see, Social Services Law § 164). A criminal past — however gruesome — was not under the statute a ground for "unemployability.”
Under the program, the local centers dispensing welfare checks determined an individual’s eligibility. Once declared employable, participants received an intake interview, eliciting their qualifications and background, and they were employed by the City provisionally, subject to investigation. Participants were asked about any criminal record. While such a record was not a disqualification from WREP, persons with a criminal record would be asked to complete a declaration of convictions, which was then used to determine both their suitability for particular jobs (for example, an individual with a history of robbery or embezzlement would not be assigned as a cashier) and the need to check further with the Police Department (for example, for outstanding warrants). The guidelines of the City Personnel Department additionally provided: "Qualifications for employment of individuals with criminal convictions will be determined for each individual on the basis of the criminal and social seriousness of the act, the age of the person at the time of the offense, the length of time since the act or acts took place, known behavior since the last criminal act, the nature of the jobs to be filled and other pertinent factors.”
Johnson appeared for his intake interview by the Department of Social Services on August 27, 1974. Based on the information he provided, his application reflected that he had no arrest record. As a matter of routine, his fingerprints were taken that day and forwarded to the City’s Department of Personnel. On the sheet containing his fingerprint record, *482 Johnson also stated that he had not been convicted of any crime, not even a moving violation. No further checking was done before he was put to work.
WREP participants were accepted within several City departments, in three job categories: clerical, human services and utility work. Utility workers’ duties were described as follows: "Under close supervision performs simple routine tasks necessary for the operation and maintenance of city department facilities and performs related work.”
On September 14 Johnson began as a Parks Department utility worker at the Parkside Playground in The Bronx. He was responsible for tidying up and maintaining his assigned station, which consisted of toilet facilities, a maintenance shed and the playground area. Johnson had a key to the maintenance shed, where supplies were kept, and he worked under the supervision of a district foreman, who visited the 25 or more parks under his jurisdiction several times weekly, for five or ten minutes each.* As distinct from a recreation director (a competitive civil service post), the City considered that the job of utility worker did not involve public contact or working with children.
Although his fingerprints were taken in August and he commenced work in September, Johnson’s prints were not actually received for processing by the Police Department until December 1974. As the City explained, WREP participants were assigned the lowest investigation priority, because State law mandated their employment, and because the City at that time faced a fiscal crisis requiring some 60,000 layoffs and the need for the Personnel Department to prepare civil service retention lists. On January 6, 1975, as the result of the Police Department’s fingerprint check — which a City witness testified normally took "maybe 20 minutes” — the Personnel Department received Johnson’s "rap sheet” reflecting his substantial criminal past.
While Johnson had told the City that he had no arrest record, the report reflected that by the time he reached the age of 21, in 1941, he had in fact accumulated a series of convictions in the South for hoboing, fighting, conspiracy to effect a prison break, assault, and breaking and entering. Then in 1946, in Queens County, he was convicted of at *483 tempted rape, robbery in the second degree and grand larceny in the first degree, and sentenced to a prison term of 15 to 30 years. Johnson was paroled in 1967. The report the City Personnel Department received from the Police Department indicated, however, that in 1968 — within months of his release on parole — Johnson was rearrested on charges of rape, assault and use of a dangerous instrument. The report stopped there.
A second report, from the State Division of Criminal Justice Services, showed that the 1968 charges were dismissed, but that Johnson’s parole was violated and he was returned to prison. He was released on July 22, 1974, at the expiration of his maximum sentence — weeks before the Department of Social Services intake interview and little more than seven months before his attack on plaintiff. The City Personnel Department, however, did not seek or receive that second report until the present lawsuit, and thus it did not know before April 8, 1975 of the parole violation or the disposition of the 1968 charges.
Plaintiff’s first jury verdict against the City, in the amount of $2.5 million, was overturned by the Appellate Division and a new trial granted, because the trial court had erroneously failed to instruct the jury that any risk of injury had to be foreseeable by the City (106 AD2d 359). After 11 trial days before a Judge and jury, a second verdict was rendered in plaintiff’s favor, this time for $3.5 million. However, this verdict was set aside by the trial court and the complaint dismissed, on the ground that Johnson’s hiring and retention were discretionary governmental acts and his attack on plaintiff was unforeseeable. The Appellate Division reversed and reinstated a reduced verdict of $2.5 million (140 AD2d 91), which we now affirm.
While several theories of liability have been advanced throughout the lifetime of this litigation, the issue now comes down to whether, as a matter of law, the City can be held liable to plaintiff for negligent retention of Johnson as its employee, or whether it is immune from liability on that basis. It is agreed that no cause of action lies for Johnson’s hiring, which was mandated by law. By the same token, no challenge is made to the factual determinations of foreseeability, causation and damages. Additionally, we need not linger long on the Appellate Division’s conclusion that the City might be held responsible here for breach of duty as owner of a public park to an invitee (see, e.g., Caldwell v Village of Is. *484 Park, 304 NY 268). Plaintiffs injury allegedly resulted from a governmental decision to retain its employee, not any proprietary function in managing a park (see, Weiner v Metropolitan Transp. Auth., 55 NY2d 175, 182), and we therefore turn directly to the question of immunity from liability for that act.
Despite the sovereign’s own statutory surrender of common-law tort immunity for the misfeasance of its employees, governmental entities somewhat incongruously claim — and unquestionably continue to enjoy — a significant measure of immunity fashioned for their protection by the courts. Governmental immunity under the decisional law of this State does not attach to every act, but when official action involves the exercise of discretion or expert judgment in policy matters, and is not exclusively ministerial, a municipal defendant generally is not answerable in damages for the injurious consequences of that action (see, Tango v Tulevech, 61 NY2d 34, 40; Arteaga v State of New York, 72 NY2d 212, 216; Weiss v Fote, 7 NY2d 579). Whether absolute or qualified, this immunity reflects a value judgment that — despite injury to a member of the public — the broader interest in having government officers and employees free to exercise judgment and discretion in their official functions, unhampered by fear of second-guessing and retaliatory lawsuits, outweighs the benefits to be had from imposing liability for that injury.
While the line separating discretionary and ministerial action may sometime blur, it is clear that "discretionary or quasi-judicial acts involve the exercise of reasoned judgment which could typically produce different acceptable results whereas a ministerial act envisions direct adherence to a governing rule or standard with a compulsory result.” (Tango v Tulevech, 61 NY2d 34, 41, supra.) Applying that test in Tango, we concluded that defendant acted within the very essence of her discretionary authority as supervisor of the Probation Department’s In-Take Unit when she refused to detain children for appearance before a Judge but instead released them to their mother. At the other extreme is McCrink v City of New York (296 NY 99), where we held on those extraordinary facts that there was no room for the exercise of reasoned judgment by the Police Commissioner in retaining an alcoholic, armed police officer presenting a known danger to the public (see, Tango v Tulevech, 61 NY2d, at 41 [characterizing the omission as "ministerial”]).
*485 We need not determine whether the City’s retention of Johnson at the Parkside Playground would be subject to absolute or qualified immunity because the City’s argument for any immunity here has a fundamental flaw. The difficulty with the City’s contention that it is entitled to a cloak of immunity for the discretionary decision to retain Johnson in his status is that there is no evidence that, prior to the rape, the City in fact made any such decision or exercised any such discretion. This is not a case of mere error of judgment of City officials in choosing to retain a WREP participant in his work assignment after learning of his criminal record. There is no indication that, before the attack on plaintiff, the City made any effort to comply with its own personnel procedures for employees with criminal records, and no indication that it made a judgment of any sort when it learned that Johnson both had a criminal record and lied egregiously about it.
The immunity afforded a municipality presupposes an exercise of discretion in compliance with its own procedures. Indeed, the very basis for the value judgment supporting immunity and denying individual recovery for injury becomes irrelevant where the municipality violates its own internal rules and policies and exercises no judgment or discretion. Given the scope of the immunity — which frees municipal defendants of liability where others in similar circumstances might have to respond in damages (see, e.g., Hall v Smathers, 240 NY 486) — that critical omission cannot be cured by later supposition that, had a review been made, the employee’s placement would have remained unchanged. Whether or not that is so, for purposes of this discussion the key fact is that no City employee in the relevant time frame weighed the impact of Johnson’s record on his work assignment or made a judgment that he should be retained at the Parkside Playground.
For much .the same reason, we reject the City’s argument for reversal based on the strong public policy favoring rehabilitation of ex-convicts (see, Eiseman v State of New York, 70 NY2d 175). The importance of employing former inmates, and reintegrating them into society, without risk of absolute liability for those who open doors to them, cannot be overstated. But even that worthy objective cannot excuse a municipal employer from compliance with its own procedures requiring informed discretion in the placement of individuals with criminal records, which in this jury’s unchallenged judg *486 ment resulted in a foreseeable risk of harm to plaintiff and proximately caused her injuries.
Finally, it should be made perfectly plain that, by affirming the Appellate Division order, we do not hold that the City here breached any "duty not to continue the assignment of an employee to a sensitive, mainly unsupervised position in a children’s playground after it learn[ed] of that employee’s violent criminal history.” (140 AD2d 91, 98; see also, McCrink v City of New York, 296 NY 99, supra.) While the City points to the record to show that, factually, Johnson’s job as a utility worker was not a sensitive, mainly unsupervised position in a children’s playground, and that the violent crime of which he was convicted took place nearly 30 years before his employment by the Parks Department, the cautionary note we sound goes beyond any factual discrepancy.
As a general proposition, it is not for courts to second-guess the wisdom of discretionary governmental choices, troubling though they may sometimes seem in the glaring clarity of hindsight. Particularly with respect to the employment of ex-convicts — who are officially free to walk the streets, visit the playgrounds, and live and work in society without being branded or segregated — the opportunity for gainful employment may spell the difference between recidivism and rehabilitation. While municipalities should not have to fear that they imperil the public fisc whenever they hire persons with criminal records, the narrow ground on which we resolve this appeal should not have the far-reaching consequence of deterring participation in programs that offer such employment opportunities.
Accordingly, the judgment appealed from and order brought up for review should be affirmed, with costs.
Chief Judge Wachtler and Judges Simons, Alexander, Titone, Hancock, Jr., and Bellacosa concur.
Judgment appealed from and order of the Appellate Division brought up for review affirmed, with costs.

 On April 8, 1975, two of the three City supervisors assigned to the district were off; the recreation director was on vacation; and another WREP worker purportedly on duty that day was checked out at 5:00 p.m.