OPINION OF THE COURT
Margaret A. Chan, J.
In two separate CPLR article 78 proceedings, petitioners, who are cabdrivers, seek annulment of Rules of the City of New York, title 35, § 58-21 (c) (5) (viii) and (f) (1),- (2) and (5) — the “Fare Reduction Rules” — promulgated by respondents New York City Taxi and Limousine Commission (TLC) and David Yassky,[1] its Commissioner. The third petition is brought by two vendors, who unsuccessfully bid for the contract to provide service under the Fare Reduction Rules. As the three petitions under index Nos. 101692/2013, 101762/2013, and 100019/2014 and their respective cross motions to dismiss are based on the same facts, they are joined for decision and order sua sponte.
Facts
On September 4, 2012, the amended 35 RCNY 58-21 (c) (5) (viii), known as the “Fare Reduction Rules,”[2] went into effect. This amendment permitted a medallion owner to deduct from its taxi drivers six cents from each fare paid by credit card. The six-cent deduction is to provide health care services and disabil *231 ity coverage to drivers. About a year later, on September 11, 2013, TLC issued Industry Notice No. 13-36, which informed drivers of, among other things, the collection of the six-cent fee to fund the “taxi driver healthcare services entity” (respondents’ answer to Ahmed petition, exhibit L). The notice explained that
“[t]he purpose of this [administrative] entity is to assist taxi drivers in choosing the best health care coverage available on the health care exchange being created by the Affordable Care Act, and to provide taxi drivers with disability coverage over and above that which is required to be provided to them by medallion owners.” (Id.)
Collection of the six-cent fee per trip was to start on October 1, 2013 (see id.)-, it was subsequently changed to February 1, 2014 (see id., exhibit J).
In finding an entity to provide and administer the health care services and disability coverage to taxi drivers, TLC issued a request for proposals (RFP) on February 6, 2013. A public meeting regarding the RFP followed on March 12, 2013, in which the expected services from the successful contractor were listed (see id., exhibit L at 8-9). On September 25, 2013, TLC awarded the contract to New York Taxi Workers Alliance (NYTWA).
On December 17, 2013, petitioners Tanvir Ahmed, Charbel Sfeir, and Guy Vieux (the Ahmed petition[ers]) commenced their hybrid article 78 petition and declaratory judgment action to annul, vacate, and set aside the “Fare Reduction Rules” — 35 RCNY 58-21 (c) (5) (viii) and (f) (1) and (5); to declare the “Fare Reduction Rules” ultra vires, violative of the separation of powers doctrine, violative of the New York City Administrative Procedure Act, violative of New York City Charter §§ 1043 and 1045, arbitrary and capricious, and that they applied only to lessor owners and lessee drivers, not medallion owners; to require TLC to return to drivers all funds deducted on the “Fare Reduction Rules”; and to award prejudgment and postjudgment interest and attorney’s fees.
On or about January 28, 2014, petitioners Adelso Raul Delorbe, Pedro Sierra, and Samson Zerai (the Delorbe petition[ers]) commenced their hybrid article 78 petition and declaratory judgment action. They alleged the same causes of action and sought the same relief as in the Ahmed petition, with an additional cause of action alleging that awarding the contract to NYTWA was arbitrary and capricious (see petition under index No. 101762/2013 at 30). Petitioners The Friendly Group, Ltd., *232 and the SEBS-The Olson Financial Group, LLC. (the vendors), commenced their hybrid article 78 petition and declaratory judgment action on or about January 6, 2014, also alleging that awarding the contract to NYTWA was arbitrary and capricious, and without rational basis, and sought to enjoin respondents from taking action on the contract and compelling TLC to rebid the contract and consider petitioners’ submitted proposals. The Friendly Group petitioners also sought to compel respondents to comply with their Freedom of Information Law (FOIL) request, and an award of costs and attorney’s fees pursuant to Public Officers Law § 89 (4) (c).
Discussion
Separation of Powers Doctrine
The crux of the Ahmed and Delorbe petitioners’ (the drivers) claim on TLC’s promulgation of the Fare Reduction Rules is that TLC exceeded its authority as it has no legislative power to enact this rule. One case these petitioners heavily relied upon is Boreali v Axelrod (71 NY2d 1 [1987]), to assert that TLC’s enactment of the Fare Reduction Rules is ultra vires and a violation of the separation of powers doctrine. In response, TLC argues that the New York City Charter granted it broad power to “adopt and establish an overall public transportation policy governing taxi. . . services,” as well as driver and public safety, and fare rates (NY City Charter §§ 2300, 2303, 2304), and distinguishes Boreali from the matter at hand.
As a backdrop on Boreali, in 1986, after the state legislature attempted, without success, to pass some 40 bills to restrict smoking in certain areas, the Public Health Council (PHC) exercised its authority under Public Health Law § 225 and issued a set of rules prohibiting smoking in indoor areas of public places, with certain exceptions; requiring employers and restaurants with seating capacities of more than 50 people to provide non-smoking areas; and providing waivers for those businesses that can show financial hardship (see 10 NYCRR former part 25). The petitioner in Boreali argued that PHC, a non-legislative body, exceeded its bounds in issuing a comprehensive code governing tobacco smoking in public places. PHC responded that the state legislature’s enactment of Public Health Law § 225 authorized it to “ ‘deal with any matters affecting the . . . public health’ ” (Boreali at 9, quoting Public Health Law § 225 [5] [a]).
The Court of Appeals, in determining whether this “broad grant of authority” (id.) infringed on the responsibility of the *233 legislative branch, looked into four “coalescing circumstances” (id. at 11). They are: whether the agency (1) considered cost-benefit or cost and privacy interests; (2) had benefit of legislative guidance; (3) acted in an area that the legislature had attempted to regulate, but failed; and (4) had technical competence or special expertise in developing the regulation (id. at 11-14; see also Festa v Leshen, 145 AD2d 49, 54 [1989]). As to the first consideration, the Court of Appeals found that PHC, in carving out exemptions to the code for bars, convention centers, small restaurants, and waivers for financial hardship, engaged in costs and privacy concerns, which is a purely legislative function. On the second factor, the court found PHC created its own set of rules without legislative guidance, in effect, writing “on a clean slate” that is atypical of administrative regulatory activity (Boreali at 13, citing Matter of Nicholas v Kahn, 47 NY2d 24 [1979]; see Packer Coll. Inst. v University of State of N.Y., 298 NY 184, 190 [1948]). As to the third factor, PHC acted in an area where the legislature had tried and failed to pass about 40 bills in restricting smoking in public places. Thus, PHC inserted its will over that of representatives who were elected by the people (Boreali at 13). Finally, the Court found no special expertise or technical competence was involved in the development of PHC’s regulations. In sum, the Court determined that PHC exceeded its statutory powers, “running afoul of the constitutional separation of powers doctrine” (Boreali at 14).
The Fare Reduction Rules at issue were promulgated by TLC under a grant of power from New York City Charter § 2300. TLC argues that the Fare Reduction Rules are based on driver and public safety while the driver petitioners claim that TLC engaged in its own cost-benefit analysis. TLC asserts that “assist[ing] taxi drivers in choosing the best health coverage available . . . [from] the Affordable Care Act, and to provide taxi drivers with disability coverage,” will benefit not only the drivers but also the public because it would “[minimize] any future fare increase needed to cover drivers’ rising health and disability costs” (respondents’ mem of law in opp to Ahmed petition at 11). Consideration of fare increases and rising health care costs leading to higher fares actually underscores a cost-benefit analysis engaged by TLC when it determined the six-cent deduction. As stated by the Court of Appeals, that is a function for the legislature (see Boreali at 11).
The Fare Reduction Rules are also bereft of legislative guidance. Even as TLC argues that it did not write the rules on a *234 clean slate, it can only point to Administrative Code of the City of New York § 19-505 (b) (3) that sets forth the requirements for an applicant for a taxi driver license — that the applicant must be “ ‘of sound physical condition with good eyesight and no epilepsy, vertigo, heart trouble or any other infirmity of body or mind . . . ” (Respondents’ mem of law in opp to Ahmed petition at 14.) How that ties to a six-cent reduction of every fare to navigate a driver to a health care plan or provide disability above and over what is required by law is unexplained. There is no nexus between the requirements for a taxi driver license and assisting taxi drivers with the Affordable Care Act and supplemental disability coverage. If TLC were concerned about a taxi driver’s health affecting the driver and the public at large, it might better serve both if the drivers were to go for an annual health checkup rather than deduct six cents from every fare to help drivers with choosing an insurance in the hopes that they will seek medical care.
As to the third circumstance reviewed by the Boreali Court, TLC posits that the legislative branch never considered deducting monies from each fare to fund an insurance navigation or supplemental disability fund. On this, TLC is decidedly sure that this prong tips in its favor. TLC is correct — no legislative body has ever thought about deducting six cents from each fare to help taxi drivers with the Affordable Care Act and supplementing their disability coverage which will make them safer drivers for the benefit of the public. However, if obtaining health insurance is the goal here, then under the Affordable Care Act, states are required to provide services to assist applicants to navigate the various health care plans. Under section 2793 under the heading “Health insurance consumer information” of the Affordable Care Act—
“(a) In general
“The Secretary shall award grants to States to enable such States (or the Exchanges operating in such States) to establish, expand, or provide support for—
“(1) offices of health insurance consumer assistance; or
“(2) health insurance ombudsman programs.” (42 USC § 300gg-93, as added by Pub L 111-148, tit I, § 1002, 124 US Stat 138 [Patient Protection and Affordable Care Act].)
Further, according to American Association of People with Disabilities, there are provisions for disability insurance coverage under the Affordable Care Act (http://www.aapd.com/resources/ *235 fact-sheets/health-reform-people-with-disabilities.html). Thus, if assistance and coverage are the focus here, then the legislative branch has spoken on it.
Finally, as to the use of specialized knowledge and expertise, TLC proffers, in its brief three-sentence argument on this point, that “the Legislature has delegated regulatory authority to [it] as it has the specialized knowledge and expertise to deal with matters of health and safety concerning taxi drivers” (respondents’ mem of law in opp to Ahmed petition at 19). It added that a New York State Supreme Court has found that TLC has the authority to promulgate driver fare reduction rules in its power to establish requirements of safety (see Greater N.Y. Taxi Assn. v New York City Taxi & Limousine Commn., 40 Misc 3d 1062 [Sup Ct, NY County 2013] [petitioners, who were medallion owners, had no standing to bring the six-cent deduction claim]). However, this court is not bound by the dicta of another court of equal jurisdiction.
Recalling TLC’s explanation as to the purpose of the six-cent deduction in its Industry Notice No. 13-36 (see respondents’ answer to Ahmed petition, exhibit L), nowhere does it speak to the expertise of this administrative entity, which is NYTWA, as that being above and beyond that of the federally funded state programs. TLC had argued elsewhere that NYTWA would provide information of added benefits that are unique to taxi drivers, such as dental and vision care, the type of doctors to see for medical conditions common to taxi drivers, and to afford disabled taxi drivers to forgo working with the supplemental disability coverage. Thus, a taxi driver who does not have good eyesight or has epilepsy, vertigo, heart trouble or any other infirmity of body or mind would refrain from driving a taxi if s/he had supplemental disability coverage. TLC also mentioned that as the taxi driver community are mostly immigrants and have limited English proficiency, NYTWA can develop services to help them (see respondents’ mem of law in opp to Ahmed petition at 12).
This court does not have expertise on health care, but, somehow, it does not appear that dental and vision issues or sitting for too long are medical conditions that are unique to taxi drivers. Further, if a taxi driver has the disabilities that would deny an applicant from obtaining a taxi driver’s license, then it begs the question why is that taxi driver on the road in the first place. Again, perhaps a required annual checkup can speak better to that. Finally, as to the limited English proficiency, TLC *236 has not shown that the federally funded state consumer assistance agencies do not or will not have information in different languages or make interpreters available. Indeed, the New York State Department of Health’s website lists agencies and their locations indicating what languages are available at those sites (see Hecker aff in support of Ahmed petition, exhibit 6). Further, the Affordable Care Act has provisions to assist such applicants. Under section 1312 (3) (“Consumer Choice”),
“The Secretary shall establish procedures under which a State may allow agents or brokers—
“(1) to enroll individuals and employers in any qualified health plans in the individual or small group market . . . .” (42 USC § 18032, as added by Pub L 111-148, tit I, § 1312, 124 US Stat 182.)
The plain language of this section is that the state confers authority to agents for this specific action to assist applicants. TLC has not received this grant of authority.
Arbitrary and Capricious Standard
In a proceeding pursuant to CPLR article 78, the scope of judicial review is limited to the issue of whether the administrative action has a rational basis for its determination (see Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County, 34 NY2d 222, 230-231 [1974]). “The arbitrary or capricious test chiefly relates to whether a particular action should have been taken or is justified . . . and whether the administrative action is without foundation in fact. Arbitrary action is without sound basis in reason and is generally taken without regard to the facts” {id. at 231 [internal quotation marks and citation omitted]). Deference is given to the agency in interpreting the regulations it administers because of its expertise in those matters, and its determination must be upheld as long as it is reasonable (see Matter of Chin v New York City Bd. of Stds. & Appeals, 97 AD3d 485, 487 [1st Dept 2012]).
According to TLC, the Fare Reduction Rules have a rational basis because they were promulgated for the benefit of the taxi drivers who are independent contractors without employer supported health insurance or disability coverage. It cites to five incidents in its RFP package wherein taxi drivers sustained serious injury or illness and were left with no compensation or insurance coverage (see respondents’ verified answer, exhibit K, last two pages). However, TLC provided no basis, rational or *237 otherwise, for the six-cent deduction. Moreover, disability coverage seems to be an afterthought for the purposes of litigation as it was not discussed anywhere in the rules or notices. It is a big unknown as to when and how taxi drivers can obtain this benefit.
The Ahmed petitioners pointed out the inconsistency of the Fare Reduction Rules that were codified in sections 58-21 (c) (5) (viii) and (f) (1) and (2), and refer to section 58-21 (k), which does not exist. TLC asserts its notices on the Fare Reduction Rules as well as the rules themselves clearly informed taxi drivers of the purpose of the collection of six cents. Following TLC’s reference to the City Record, and its “Notice of Promulgation of Rules” (id., exhibits C, H, respectively), the purpose of the Fare Reduction Rules appears nowhere. The only reference to the six-cent deduction and health care is under “'Credit Card Charges” — “an Owner . . . must pay a Driver in cash, on a daily basis, the total amount of all credit card payments made during the Driver’s shift, less the $.06 per trip driver health surcharge described in subdivision 58-21(k).” However, subdivision 58-21 (k) was not included in the City Record as it ended with subdivision 58-21 (j) and the notice included no reference to any rules or statutes (id., exhibit C at 1497-1498 of the City Record; exhibit H at 4). The language on the purpose of the Fare Reduction Rules is unclear as to its intent. It states that “TLC plans to select a health care assistance entity to provide driver health care and disability coverage.” It is unclear that the six cents goes to navigating the Affordable Care Act, and not provision of health care coverage.[3] Further, again, there is not one mention of how this disability coverage applies. The following sentence is also unclear, and the sentence is not taken out of context — “[flunds will be collected in the following manner; T-PEP vendors will charge Owners 6 cents per trip, and owners will pass this cost on to Drivers by deducting the sum from Drivers’ credit card receipts.” One can take this to mean that drivers will be charged six cents per trip — whether the fare is paid by credit card or cash — and the owner will deduct that amount from the drivers’ credit card receipts (id., exhibit H at 1). However, as the Fare Reduction Rules appear under section 58-21, “Leasing a Taxicab or Medallion,” the Ahmed petitioners *238 point out that if the rules are deemed valid, then they apply only to lessors and not lessees. Thus, they reason that the rules do not apply to drivers who own the cabs that they themselves drive. The rules do not clarify this point. The Delorbe petitioners raised the issue of whether a driver who has health insurance and therefore does not need the program is still required to pay the six cents per fare. The rules do not speak to this issue.
Accordingly, absent any clear defined information on what the six cents are for besides paying for an outside contractor such as NYTWA to assist taxi drivers navigate the Affordable Health Act — assistance which states provide free of charge to applicants — TLC’s promulgation of the Fare Reduction Rules is arbitrary and capricious, and without a rational basis.
Awarding the Contract to NYTWA
Both the Delorbe and the vendor petitioners claim that TLC’s selection of NYTWA as the winning bidder was arbitrary and capricious. At the outset, the Delorbe petitioners, who are taxi drivers, do not have standing to challenge the award. TLC sought dismissal of the vendors petition for failure to exhaust their administrative remedies. In light of the foregoing finding that the promulgation of the Fare Reduction Rules was arbitrary and capricious, this issue is academic.
In any event, pursuant to Procurement Policy Board Rules (PPB Rules) (9 RCNY) § 2-10, a vendor challenging the selection process must file a protest within 10 days from obtaining knowledge of the facts on which the challenge is based. There were two protests filed. The first protest was timely filed by The Friendly Group on September 27, 2013; copetitioner SEBSThe Olson Financial Group did not file one. The Friendly Group’s protest took issue with the terms of the RFP rather than the proposal selection process. As the RFP was ultimately finalized on May 30, 2013, the protest filed on September 27, 2013 was untimely.
On September 25, 2013, the vendor petitioners learned that their proposals were rejected and NYTWA was selected. They filed a protest challenging the selection process on December 16, 2013. The second protest is also time-barred under the mandate of PPB Rules § 2-10. TLC responded to the December 16th protest on January 6, 2014. It maintained its prior decision that the procurement will proceed (see respondents’ cross motion, exhibit P). The vendor petitioners commenced their joint article 78 proceeding on or about January 6, 2014.
*239 Whether the article 78 was timely commenced is not the issue when the underlying protests were untimely filed. Considering TLC’s second letter restated its response to the first protest, that second response was, in effect, a courtesy. Thus, the vendor petitioners’ article 78 proceeding is dismissed. Given the finding that the vendors untimely submitted their protest letters, their FOIL issue will not be addressed.
Monetary Award
The driver petitioners sought a monetary award that included restitution, interest, damages, costs, and attorney’s fees. Pursuant to CPLR 7806—
“Any restitution or damages granted to the petitioner must be incidental to the primary relief sought by the petitioner, and must be such as he might otherwise recover on the same set of facts in a separate action or proceeding suable in the supreme court against the same body or officer in its or his official capacity.”
Whether damages are characterized as incidental “is dependent upon the facts and issues presented in a particular case” (Matter of Gross v Perales, 72 NY2d 231, 236 [1988]). Under the facts of this case, the taxi drivers’ claim was that TLC acted arbitrarily and capriciously in promulgating the Fare Reduction Rules. Generally, incidental damages are confined to monies that an agency either collected from or withheld from a petitioner and then was obligated to reimburse after a court annulled a particular agency determination. Thus, the monetary claim to reclaim the sum of all the six cents from each fare is incidental to the main claim.
However, the doctrine of governmental immunity shields respondents here, because the act is an official action that “involves the exercise of discretion or expert judgment in policy matters, and is not exclusively ministerial” (Haddock v City of New York, 75 NY2d 478, 484 [1990]). Thus, petitioners’ monetary claims must be denied (see Metropolitan Taxicab Bd. of Trade v New York City Taxi & Limousine Commn., 38 Misc 3d 936, 943-944 [Sup Ct, NY County 2013], affd 115 AD3d 521 [1st Dept 2014]).
Conclusion
It is hereby ordered, the Ahmed petition under index No. 101692/2013 and the Delorbe petition under index No. 101762/ 2013 are granted only to the extent that the Fare Reduction *240 Rules are declared to be violative of the separation of powers doctrine, as well as being arbitrary and capricious, and therefore, the Fare Reduction Rules under 35 RCNY 58-21 (c) (5) (viii) and (f) (1), (2) and (5) are annulled. The petitioners’ respective claims for monetary damages, costs, and attorney’s fees are denied, and it is further ordered, the vendors’ petition under index No. 100019/2014 is dismissed.

. David Yassky is no longer the Commissioner of TLC as of January 1, 2014.

. The “Fare Reduction Rules” are under 35 RCNY 58-21, and are also referred to as the “Six Cents Rules” or “Health Care Fare Reduction Rules” in the parties’ petitions/memoranda of law.

. According to the Delorbe petitioners, TLC had informed drivers that the purpose of the Fare Reduction Rules was to create a fund to provide them with (1) health care coverage; (2) disability coverage; and (3) Affordable Care Act navigation (see Delorbe mem of law in support of petition at 11).