**Mary F. MULLOY, as Administratrix of the Estate of Carol Mulloy Cuttle, Plaintiff,**

v.

**UNITED STATES, Defendant.**

**Civ. A. No. 93–11716NG.**

United States District Court, D. Massachusetts.

March 31, 1995.

---

Robert W. Thuotte, Witmer & Associates, Boston, MA, for plaintiff.

Susan G. Winkler, U.S. Atty's Office, Boston, MA, Phyllis J. Pyles, Steven K. Forjohn, U.S. Dept. of Justice, Torts Branch, Civ. Div., Washington, DC, and Annette Forde, U.S. Atty's Office, Boston, MA, for defendant.

## MEMORANDUM AND ORDER

GERTNER, District Judge:

### I. INTRODUCTION

On November 29, 1990, Carol Cuttle was kidnapped from a parking lot on the United States Army base at Schweinfurt, Germany. Ms. Cuttle, who lived on the base with her husband, an Army Captain, was subsequently taken to another location, where she was beaten, raped, robbed, and ultimately strangled to death. The perpetrator of this crime was one Private Dwan Gates, who later confessed to the offense and was sentenced by a Court Martial to life imprisonment.

Subsequent to Ms. Cuttle's murder, an investigation by the Army's Inspector General ("IG") discovered that Private Gates had had an extensive criminal record, including a previous rape conviction, at the time he had enlisted in the Army. The IG's investigation further determined that the Army personnel involved in Gates' recruitment and enlistment had failed to properly investigate his criminal background, and thus had failed to discover Gates' criminal past. Had this past been discovered, Gates would have been excluded by law from enlisting in the Army.

The plaintiff, the administratrix of Ms. Cuttle's estate, brought this action under the Federal Tort Claims Act, 28 U.S.C. § 1346(b) ("FTCA"), charging that the negligence of the government was the proximate cause of Ms. Cuttle's rape and murder. Plaintiff contends that the Army breached a duty to Ms. Cuttle when it failed to investigate Gates' criminal background prior to his enlistment, when it failed to prevent him from coming into contact with her subsequent to his enlistment, and when it failed to warn her of his violent tendencies.

The government has moved to dismiss this action for lack of subject matter jurisdiction. The government contends that plaintiff's claims are barred because they "aris[e] out of assault [or] battery," and thus fall within a statutory exception to the FTCA's general waiver of sovereign immunity. 28 U.S.C. § 2680(h). In addition, the government contends that any failure on its part to warn or protect Ms. Cuttle or to properly supervise or control Gates must also be barred by two other FTCA exceptions, which exclude claims arising on foreign soil (28 U.S.C. § 2680(k)), or arising from the exercise of a discretionary government function (28 U.S.C. § 2680(a)). For the reasons stated below, the government's motion is **DENIED**.

### II. FACTS

On May 17, 1990, Dwan Gates walked into the Army's West Madison Street Recruiting Station in Chicago, and expressed his interest in becoming a soldier. This was Gates'

second attempt at enlistment. Five months earlier, Gates had attempted to enlist at the same recruiting station, but had been rejected because he was the subject of an ongoing criminal prosecution.

This time, however, Gates was successful. On May 31, 1990, after completing the Army's medical and vocational tests, he shipped to Fort Knox, Kentucky, for training as an armor crewman. Eventually, he was transferred to the Army base at Schweinfurt, where the rape and murder of Ms. Cuttle occurred.

After Gates was apprehended and confessed to the attack on Ms. Cuttle, his lengthy criminal record came to the attention of Army personnel. It was revealed that, prior to his enlistment, Gates had been convicted, on three separate occasions, of serious crimes. His first conviction occurred in April, 1986, when he was tried as a juvenile and found guilty of aggravated burglary and rape. In 1987, he was convicted as an adult of burglary and attempted theft, and in 1989 he was convicted again on a variety of weapons charges. Because federal law bars convicted felons from entering the armed forces except by special waiver, these facts, had they been known, and had there been no waiver, would have barred Gates' enlistment.

After Gates' criminal history was revealed, the Army's Recruiting Command (USAREC) conducted an internal investigation to determine why his application had been allowed to proceed. This investigation resulted in a finding that USAREC had done nothing improper.

Subsequently, at the behest of Ms. Cuttle's relatives, the IG conducted an independent investigation of USAREC's handling of Gates' enlistment. Contrary to USAREC's internal report, the IG's investigation discovered widespread misfeasance at every step of the recruitment process and found that USAREC's own investigation had failed to comply with Army regulations. The report concluded that were it not for the "dereliction or apathetic performance" of duty by USAREC personnel, Gates' enlistment would never have been approved.

The IG's report found two significant areas in which Gates' enlistment was mishandled. The first related to the failure of USAREC personnel to investigate discrepancies in the information which Gates' had provided on his application form. Gates stated that he had attended Lawrence Gardner High School in Kansas from September, 1984 until June, 1986, and that he had attended National Technical College in Chicago from August 1986 until October, 1989. This information was contradicted by his high school diploma, which indicated a December, 1987 graduation date, and by his high school transcript, which indicated that he had attended Leavenworth High School from 1984 to 1987, had passed the GED exam in October 1987, and had not been released from "Lawrence Gardner High School–Youth Center" until October, 1988. Had recruiters investigated this discrepancy, they would likely have discovered that Gates' had been attending high school in a Kansas youth detention facility, where he had been serving time for crimes he had not reported to his recruiter. Moreover, the mere fact that Gates' had made misrepresentations on his application would have disqualified him for enlistment.

Gates' application also misstated his criminal history. It failed to reveal any of his previous convictions, and stated only that he had been arrested on drug possession charges, but that the charges had been dropped. Even in that case, however, Gates' description was inconsistent with court documents. The dates were incorrect and the documents showed that the charges had not been dropped, but that he had been acquitted after a trial. Nonetheless, no USAREC personnel investigated the matter further.

The second area in which the IG's report found negligence by USAREC personnel was in the conduct of Gates' background check. Army regulations require that a two stage Entrance National Agency Check (ENTNAC) be conducted for every new enlistee. In the first stage, the requesting agency provides information about the enlistee to the Defense Investigative Service (DIS), which in turn conducts an automated search of national crime databases to determine if the enlistee has a criminal record. If this search

reveals a possible match, the requesting agency may then initiate a "manual" search, in which specific court records relating to the enlistee's criminal history are produced.

In Gates' case, USAREC personnel in Chicago initiated an ENTNAC for Gates on May 21, 1990, shortly after his enlistment. However, on May 31, 1990, prior to receiving a response from DIS, Gates was shipped to Fort Knox, Kentucky to begin his training. On June 5, 1990, DIS reported that the ENTNAC had revealed a "possible match" of a criminal record with the potential enlistee. This should have alerted the Army to Gates' criminal past. However, because Gates' had already shipped to Fort Knox, Army regulations required the USAREC personnel in Chicago to forward this initial result to Fort Knox, for further investigation. They failed to do so. Moreover, Fort Knox personnel had an independent obligation pursuant to Army regulations to conduct their own investigation if, as was the case, no ENTNAC report had been placed in Gates' recruiting file within five weeks of his enlistment. No such investigation was made.

As a result of these various failures of duty by Army personnel, Gates was permitted to complete basic training, and to ship overseas to Germany, without any meaningful scrutiny of his personal history. The Inspector General's report indicated that six recruiting experts "clearly opined that had any one person involved with PVT Gates' enlistment process complied with established policies, regulatory guidance, proper procedures, and accepted recruiting practices, PVT Gates' ineligibility for enlistment into the U.S. Army would have been readily disclosed."

## III. SUBJECT MATTER JURISDICTION STANDARD

■ In considering a motion to dismiss, the Court assumes that all the material allegations set forth in the complaint are true. *Williams v. City of Boston,* 784 F.2d 430, 433 (1st Cir.1986). The averments of the complaint, as well as the proper inferences arising therefrom, are liberally construed in favor of the plaintiff and the claim will not be dismissed unless "it appears beyond doubt that the plaintiff can provide no set of facts in support of [her] claim which would entitle [her] to relief." *Id.*

## IV. ANALYSIS

### A. The Assault and Battery Exception

The government's principal argument is that this action is barred by the so-called "assault and battery" element of the intentional tort exception to the FTCA. That exception, codified at 28 U.S.C. § 2680(h), provides, in relevant part, that the provisions of the FTCA shall not apply to "any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights ..." The United States contends that, to the extent that plaintiff has stated a cause of action, that action arose out of Private Gates' assault and murder of Ms. Cuttle, and thus falls squarely within the category of claims against which sovereign immunity still applies.

Plaintiff, naturally, disagrees. Under plaintiff's theory, her cause of action arose not from Private Gates' assault, but from the negligence of Army recruiting personnel, who permitted Private Gates to enlist notwithstanding numerous disqualifying factors. Thus, while it is true that Private Gates' intentional assault was the immediate cause of plaintiff's damages, plaintiff argues that Gates' actions were the foreseeable result of the Army's independent negligence in allowing him to enlist.

### 1. The Scope of Assault and Battery Exception

Many courts have noted that the language of § 2680(h), at least when taken out of context, is broad enough to exclude virtually any claim against the government in which assault and battery plays a part. *See Sheridan v. United States,* 487 U.S. 392, 398, 108 S.Ct. 2449, 2453–54, 101 L.Ed.2d 352 (1988); *Doe v. United States,* 838 F.2d 220, 223 (7th Cir.1988); *Panella v. United States,* 216 F.2d 622, 623 (2nd Cir.1954). *See also United States v. Shearer,* 473 U.S. 52, 55, 105 S.Ct. 3039, 3041–42, 87 L.Ed.2d 38 (1985) (plurality of four justices holding in *dicta* that § 2680(h) bars all claims which "stem from a

battery committed by a government employee").

Indeed, up until 1988, some courts took the position that § 2680(h) should be read broadly, effectively barring any claim involving an assault or battery, at least where a government employee committed the act. *See Shearer,* 473 U.S. at 55, 105 S.Ct. at 3041–42 (plurality opinion); *Garcia v. United States,* 776 F.2d 116 (5th Cir.1985); *Thigpen v. United States,* 800 F.2d 393, 395 (4th Cir. 1986); *Hughes v. United States,* 662 F.2d 219 (4th Cir.1981); *Hoot v. United States,* 790 F.2d 836 (10th Cir.1986); *Johnson v. United States,* 788 F.2d 845, 850–854 (2d Cir.1986). Other courts, however, read the exception more narrowly, refusing to bar claims alleging that antecedent governmental negligence (e.g. negligent hiring, negligent supervision, negligent failure to protect) permitted a government employee to commit an assault. *See Gibson v. United States,* 457 F.2d 1391 (3rd Cir.1972); *Doe,* 838 F.2d at 223; *Bennett v. United States,* 803 F.2d 1502 (9th Cir.1986); *Kearney v. United States,* 815 F.2d 535 (9th Cir.1987); *Underwood v. United States,* 356 F.2d 92, 100 (5th Cir.1966); *Loritts v. United States,* 489 F.Supp. 1030 (D.Mass.1980); *Gale v. United States,* 491 F.Supp. 574 (D.S.C.1980); *Bryson v. United States,* 463 F.Supp. 908, 912 (E.D.Pa.1978). Moreover, courts have uniformly permitted claims arising out of assaults by non-employees, where governmental negligence was a contributing cause. *See United States v. Muniz,* 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963); *Jablonski v. United States,* 712 F.2d 391, 395 (9th Cir.1983); *Rogers v. United States,* 397 F.2d 12 (4th Cir.1968); *Panella,* 216 F.2d at 623.

In 1988, the Supreme Court's decision in *Sheridan v. United States,* 487 U.S. 392, 108 S.Ct. 2449, 101 L.Ed.2d 352 (1988), clarified, to some extent, the scope of § 2680(h)'s assault and battery exception. The plaintiffs in *Sheridan* had been shot by an off-duty navy corpsman, who was employed at the Bethesda Naval Hospital. Prior to the shooting, the corpsman had been discovered by other Navy personnel wandering around in a drunken stupor on hospital grounds, carrying a rifle. Rather than restrain the corpsman, the Navy personnel fled the scene, and the corpsman subsequently shot his rifle into a passing car, injuring the plaintiffs.

The *Sheridan* plaintiffs alleged that the government had been negligent in failing to restrain the corpsman, who was drunk and carrying a weapon on Navy property, in violation of Navy regulations. The government defended on the ground that the plaintiffs' claim was barred by the assault and battery exception. The court held that the claim was not barred.

The court began its analysis by recognizing that the assault and battery exception had never been interpreted as a complete bar to claims in which an assault and battery was the direct cause of the plaintiff's injury. 487 U.S. at 398–399, 108 S.Ct. at 2454. In *United States v. Muniz,* 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963), for example, the court had held that a prisoner could bring suit against the government for damages resulting from an assault by other prisoners which prison guards had negligently permitted to take place.

The *Sheridan* Court posited two theories which could explain why such a claim did not "arise out of" an assault or battery, within the meaning of § 2680(h). First, it could be argued that the plaintiff's injuries were the result of multiple causes: the intentional tort of the assailant, and the government's prior negligence. Under this view, the government's liability would not "arise out of" the assault, but rather would stem from its own antecedent negligent acts. 487 U.S. at 399, 108 S.Ct. at 2454.

While not rejecting this theory, the court chose instead to base its decision on a second, more narrow analysis: It focused on whether the assault in question fell within the scope of the FTCA's general waiver of immunity in the first place. 487 U.S. at 400, 108 S.Ct. at 2455. By this waiver of immunity, the government agreed to submit to claims for the "negligent or wrongful act[s]" of government employees "acting within the scope of [their] office or employment." 28 U.S.C. § 1346(b). The assault and battery exception to this general waiver (§ 2680(h)) only carved out liability for acts which would otherwise be actionable under this section,

namely, those of government employees acting within the scope of their employment. Since the assaults of *non-employees,* as in *Muniz,* were not within § 1346(b)'s waiver, government negligence permitting them could not be immunized by § 2680(h). Similarly, where a claim of negligence involved an assault by a government employee acting outside the scope of his employment, as was the case in *Sheridan,* § 2680(h) did not bar the claim if the government was otherwise negligent in permitting the assault to occur. 487 U.S. at 400–402, 108 S.Ct. at 2455–56.

In declining to apply § 2680(h) to the particular facts before it, the *Sheridan* court indicated that it was motivated, at least in part, by a desire to avoid "perverse" results which would flow from a contrary ruling. 487 U.S. at 401, 108 S.Ct. at 2455. Where the negligence of the government creates the opportunity for an assault to occur, it would be "absurd" for government liability to turn on the formal employment status of the assailant, when the assault was completely unrelated to the scope of the assailant's employment. 487 U.S. at 402 & n. 7, 108 S.Ct. at 2456 & n. 7.

Liability under the theory of negligence which the *Sheridan* plaintiffs presented was premised on the government's failure to adequately protect the plaintiff from a foreseeable danger. That liability would persist no matter if the danger in question was a vicious animal, a dangerous chemical, or an explosive device, rather than a violent human being. 487 U.S. at 403, 108 S.Ct. at 2456. Thus, the state of mind, indeed the very fact that the assailant is a human being, is quite irrelevant to the government's liability. *Id.* So too is his mere status as a government employee without more.

### 2. Whether the Assault and Battery Exception Bars Claims For Negligence in the Hiring or Supervision of Employees

While holding that the employment status of the assailant does not, as an absolute matter, bar claims that government negligence permitted the assault, the court did hold open the possibility that employment status might be relevant to the inquiry in some instances. 487 U.S. at 403, n. 8, 108

S.Ct. at 2456, n. 8. In particular, the court stated that "it is not appropriate in this case to consider whether negligent hiring, negligent supervision, or negligent training may ever provide the basis for liability under the FTCA for a foreseeable assault or battery by a Government employee." *Id.*

The issue of negligent hiring and supervision, raised but not resolved in *Sheridan,* remains a problematic one, and is central to the disposition of this case. Logically, there is no reason to distinguish between governmental negligence in creating or monitoring the employment relationship, and other kinds of negligence resulting in an assault by an employee. So long as governmental negligence contributes to an assault by a government employee acting outside the scope of his employment, it would seem that *Sheridan*'s reasoning would be applicable. In all cases, liability would turn not on the status of the assailant, but on the preceding negligence of other government employees. Such a rule would be consonant with the FTCA's purpose of compensating the victims of negligence, while at the same time avoiding strict governmental liability for intentional torts which it is powerless to prevent. *See Kearney v. United States,* 815 F.2d 535, 536–537 (9th Cir.1987); *Bennett v. United States,* 803 F.2d 1502, 1503–1504 (9th Cir.1986).

As a practical matter, however, the imposition of liability for negligent hiring and supervision raises the possibility that artful pleading will permit plaintiffs to circumvent § 2680(h)'s exclusion. *See Sheridan,* 487 U.S. at 409, 108 S.Ct. at 2459 (O'Connor, J., dissenting); *Shearer,* 473 U.S. at 55, 105 S.Ct. at 3041–42. Under the worst case scenario, a plaintiff would need only find some suggestion that the government had prior awareness of the employee's dangerous tendencies, and failed to act on it, in order to bring the case to trial. *See Bajkowski v. United States,* 787 F.Supp. 539 (E.D.N.C. 1991) (rejecting precisely such a claim).

In the almost 6 years since *Sheridan,* there have been remarkably few published cases applying *Sheridan* with respect to injuries caused by the assault of a government employee. *See Bembenista v. United States,* 866 F.2d 493, 497–498 (D.C.Cir.1989); *Hal-*

lett v. United States Dept. of the Navy, 850 F.Supp. 874 (D.Nev.1994); Bajkowski v. United States, 787 F.Supp. 539 (E.D.N.C. 1991); Martinez v. United States, 740 F.Supp. 399, 403 (D.S.C.1990); Harris v. United States, 797 F.Supp. 91 (D.P.R.1992). Fewer still have applied its reasoning to allegations of negligence in the hiring or supervision of government employees, (see Bajkowski, 787 F.Supp. at 540–542; Martinez, 740 F.Supp. at 403; Harris, 797 F.Supp. at 94–95), and only two Bajkowski, Harris ) have extensively analyzed the issue.

In Bajkowski, the plaintiff was a private citizen who lived near Fort Bragg, North Carolina. She brought suit against the government after she was brutally assaulted by a soldier who was stationed there. The soldier had a long record of criminal violence, and was on pre-trial release on a rape charge at the time of his assault on the plaintiff. Bajkowski charged that the government was negligent in reenlisting, retaining and supervising the soldier, in light of his violent background.

The court rejected Bajkowski's claim. It found that the Sheridan Court had "essentially adopted" a test suggested in Chief Judge Winter's dissenting opinion in the Fourth Circuit's Sheridan decision. See Sheridan v. United States, 823 F.2d 820, 825 (4th Cir.1987). Under this test, the assault and battery exception applies unless "the government would be liable if the assailant was not a government employee." 787 F.Supp. at 541. The Bajkowski claim was predicated solely on the proposition that the government should have either not permitted the reenlistment of the soldier or should have detained him. Since these claims had no meaning if the soldier were not a government employee, the court found that the test was not satisfied, and that the assault and battery exception barred recovery. See also Martinez, 740 F.Supp. at 403 (rejecting, without analysis, negligent supervision claim arising out of assault by soldier).

If the reasoning in Bajkowski were in fact the reasoning of the Supreme Court in Sheridan, there would have been no reason for the court to have reserved decision on "negligent hiring, negligent supervision or training" as it did. 487 U.S. at 403 n. 8, 108 S.Ct. at 2456 n. 8. These causes of action would have been plainly included in the assault and battery exception.

In my view, Bajkowski misinterprets the Supreme Court's holding in Sheridan, and consequently overstates the breadth of the assault and battery exception. Contrary to Bajkowski, the Supreme Court never adopted Judge Winter's dissent in the case below. Although the court quotes from Judge Winter's opinion in its description of the conflicting interpretations of § 2680(h) (see 487 U.S. at 397, 108 S.Ct. at 2453), its holding is based largely on the reasoning of Judge (later Justice) Harlan in Panella v. United States, 216 F.2d 622 (2nd Cir.1954). Panella, like Sheridan, focused not on the extent to which the allegedly negligent government's acts were somehow related to the assailant's employment status, but on whether the government's acts would otherwise come within the scope of the general FTCA waiver of immunity in the first instance (i.e. whether they are negligent acts of government employees acting within the scope of their employment). Sheridan, 487 U.S. at 400–401, 108 S.Ct. at 2455. The government could be liable for the role its independent negligence played in an assault by a third party.[1] Likewise, the government could be

---

1. Panella involved a claim by one inmate for an assault committed by another. He sued the United States, claiming that the assault was caused by the negligence of employees of the United States in failing to provide adequate guards and otherwise properly supervise those confined in the institution. The court found that the action did not fit within § 2680(h), with the following analysis:

> ... [I]n one case a person is assaulted by a government employee who becomes angered by a discussion about a matter within his juris-

diction; in another, a visitor to a government prison is assaulted by a prisoner as a result of the prison guards being improperly off duty. Since in the absence of § 2680(h) the assault in the first case might give rise to an action against the government without any showing of negligence, it is not difficult to imply that the § 2680(h) exception was intended to exonerate the Government from all liability of this nature, no matter what the form of the action. But that implication is not so easily reached in the second case where the assault, absent neg-

liable for the role its independent negligence played in an assault by a government employee, outside the scope of his employment, an act not covered by *respondeat superior*.

Accordingly, it is plain that nothing in *Sheridan* logically requires a rule barring all claims alleging negligent hiring and negligent supervision by the government, particularly in cases such as the instant one, where a negligent decision to hire led to an assault which was committed outside of the employee's scope of employment. *See* 487 U.S. at 403, n. 8, 108 S.Ct. at 2456, n. 8 (declining to consider the question).

A more plausible analysis of Bajkowski's claims, and one which still results in dismissal, turns on the particular facts upon which Ms. Bajkowski based her claim of negligence. As the opinion describes her case, Ms. Bajkowski never alleged any special reason why the government had an obligation to protect her from the soldier in question. She was not, for example, a member of the military community, and nothing in the opinion suggests that she was even on government property, or dealing with the soldier in his official capacity when the assault occurred. Since the soldier was off-base and off-duty when he attacked Ms. Bajkowski, it would appear that there was no causal connection between the Army's retention of him as an employee, and his ability to commit the attack in question. Yet such a causal connection is precisely what is required under North Carolina law to state a cause of action against an employer. *See Braswell v. Braswell*, 330 N.C. 363, 410 S.E.2d 897, 902–904 (1991) (no liability for negligent retention and supervision where employee's bad act occurred outside the workplace, while employee was off-duty). It would thus appear that any perceived need to shield the government, through an expansive

reading of § 2680(h), from general liability for employee assaults, was misplaced, at least in this instance.

I believe the better view of § 2680(h)'s scope is found in the Ninth Circuit's opinion in *Bennett v. United States*, 803 F.2d 1502 (1986). In *Bennett*, children at a government run school had been sexually assaulted by one of their teachers. The teacher, it turned out, had been hired by the government in spite of a warrant outstanding against him in connection with a child molestation charge in Oklahoma. The court held that the plaintiffs had properly stated a cause of action against the government for negligently hiring and retaining the teacher.[2] The court reasoned that it was the purpose of the FTCA to "provide a forum for the resolution of claims against the federal government for injury caused by the government's negligence." 803 F.2d at 1504 (citing *Dalehite v. United States*, 346 U.S. 15, 24–25, 73 S.Ct. 956, 962, 97 L.Ed. 1427 (1953)). As the *Sheridan* Court would subsequently observe, it would be entirely irrational to hold the government liable for its failure to protect third parties from non-employees (*see Muniz, supra*), but to deny any relief where the government fails in exactly the same way with respect to a dangerous employee, acting outside the scope of his employment. 487 U.S. at 402, 108 S.Ct. at 2456.

Although *Bennett* predated *Sheridan*, a similar duty-focused inquiry was adopted by the District of Columbia Circuit in *Bembenista*, 866 F.2d at 497–498. Ms. Bembenista was a patient at Walter Reed Army Medical Center in Washington. She was suffering from insulin shock and was blind and semi-comatose when she was sexually assaulted by a hospital employee. The court refused to

---

ligence, would not give rise to any liability on the part of the Government. Indeed the assault and battery exception would seem to be the only type of conduct among those contained in § 2680(h) where the question we have here would arise, for it is hard to conceive of a situation involving any of the other acts specified in that Section in which the Government would be liable if the act were committed by someone other than a government employee. Hence, to accept the Government's position on this appeal would in effect require us to read the assault and battery ex-

ception as having a wider impact than any of the other exceptions in § 2680(h)—i.e., that it embraces actions whose entire legal foundation rests solely on the failure of the Government to perform its duties. We think that the provision cannot properly be so expanded. 216 F.2d at 623.

2. In contrast to the situation in *Bajkowski*, it was undisputed in *Bennett* that the government had an affirmative duty to protect school children from the attacks of adult predators.

dismiss the action under § 2680(h). It noted that the hospital had a special duty to protect Ms. Bembenista while she was in its custody, since she was clearly in no position to protect herself. Thus, the fact that a breach of that duty happened to result in an employee, rather than a stranger, committing the assault, did not bar the action under the assault and battery exception. 866 F.2d at 498. *Accord Harris,* 797 F.Supp. at 93–94 (holding that § 2680(h) did not bar suit for negligence where government allegedly breached duty to protect school children from teacher who molested them).

 All of these cases illustrate the basic lesson of *Sheridan:* Liability should not attach to the government merely because a government employee intentionally assaults a third party. Liability should not result from a theory of *respondeat superior,* but neither should it arise from claims suggesting that the government owes a duty to the world to prevent its employees from committing foreseeable violent acts, whether on or off the job. Rather, liability should only attach with respect to assaults by government employees, where the government owes (and breaches) an independent duty to the victim not to act, or to refrain from acting, in a way which would place that victim in foreseeable danger. *Sheridan,* 487 U.S. at 403, 108 S.Ct. at 2456; *Doe,* 838 F.2d at 223; *Bennett,* 803 F.2d at 1503–1504; *Bembenista,* 866 F.2d at 497–498; *Harris v. United States,* 797 F.Supp. 91 (D.P.R.1992); *Loritts v. United States,* 489 F.Supp. 1030 (D.Mass.1980); *Underwood,* 356 F.2d at 92.

### 3. *Whether the Government Breached a Duty to Ms. Cuttle by Enlisting and Retaining Dwan Gates*

The proper focus of this analysis then, is not on the violent acts of Private Gates, who was clearly acting outside of the scope of his employment when he committed them, but on the acts of those Army personnel who, it is alleged, negligently permitted Gates to join

the Army, and thus to attack Ms. Cuttle on an Army base in Germany. Put another way, I must decide whether the alleged acts (and failures to act) of Army personnel, stationed principally in Chicago, breached a duty which they owed to Ms. Cuttle, proximately causing her death.

 It is well established that as a general rule, there is no duty to protect others against the criminal acts of third parties. *Ono v. Chicago Park District,* 235 Ill.App.3d 383, 176 Ill.Dec. 474, 477, 601 N.E.2d 1172, 1175 (1992).[3] A defendant may, however, be considered negligent for its failure to protect against such intentional acts where the defendant realizes or should realize that its act or omission involves an unreasonable risk of harm to another through the acts of the third person. *See* Restatement (Second) of Torts § 302B (1965); *Neering v. Illinois Cent. R. Co.,* 383 Ill. 366, 50 N.E.2d 497, 502–504 (1943). Typically, such liability is found where the existence of a "special relationship" between the parties imposed on the defendant a duty to protect the plaintiff from harm. *See Neering,* 50 N.E.2d at 502–504 (duty of railroad to passenger); *Ono,* 176 Ill.Dec. at 477, 601 N.E.2d at 1175 (duty of land owner to invitee); *Petrauskas v. Wexenthaller Realty Management, Inc.,* 186 Ill. App.3d 820, 134 Ill.Dec. 556, 560, 542 N.E.2d 902, 906 (1989) (duty of landlord to tenant). However, liability may also be found if the defendant negligently facilitates the commission of a crime by the third person, for example, by undermining a security system, or by placing that person in a position where he could commit an offense. *Mims v. New York Life Insurance Co.,* 133 Ill.App.2d 283, 273 N.E.2d 186, 187 (1971) (landlord liable when it left tenant's apartment door unlocked, permitting theft to take place); *Malorney v. B & L Motor Freight, Inc.,* 146 Ill.App.3d 265, 100 Ill.Dec. 21, 23–24, 496 N.E.2d 1086, 1088–1089 (1986) (trucking company liable for rape of hitchhiker, where it was foreseeable that trucker with criminal sexual assault background, who was entrust-

---

**3.** The FTCA permits suit against the United States "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." In this

case, the principal acts of alleged negligence took place in Illinois, and the parties apparently concede that plaintiff's claims must be analyzed with respect to Illinois law.

ed with truck equipped with sleeping quarters, would pick up hitchhikers in violation of company policy); *Rosenberg v. Packerland Packing Co.*, 55 Ill.App.3d 959, 13 Ill.Dec. 208, 212, 370 N.E.2d 1235, 1239 (1977) (trucking company liable for assault committed by truck driver using truck where trucking company knew driver was mentally unstable). Moreover, where the defendant voluntarily undertakes a duty to protect the plaintiff, the negligent failure to perform that duty properly may also result in liability. *Cross v. Chicago Housing Authority*, 74 Ill.App.3d 921, 30 Ill.Dec. 544, 549–51, 393 N.E.2d 580, 585–587 (1979) *aff'd on other grounds*, 82 Ill.2d 313, 45 Ill.Dec. 121, 412 N.E.2d 472 (1980). *See also Indian Towing Co. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955).

None of these theories depend on the employment status of the person directly causing the harm. Rather, they ask whether the defendant, through a breach of duty, permitted a person, employee or otherwise, to commit an intentional tort against the plaintiff.

■ These cases suggest at least three theories by which the United States would be held liable in this case under Illinois law. First, by negligently enlisting Dwan Gates into the Army, the United States affirmatively created the conditions under which he was able to perpetrate his crimes against Ms. Cuttle. *See Mims*, 273 N.E.2d at 187; *Malorney*, 100 Ill.Dec. at 23–24, 496 N.E.2d at 1088–1089; *Rosenberg*, 13 Ill.Dec. at 212, 370 N.E.2d at 1239. While his enlistment did not guarantee that he would be sent to Schweinfurt, it was quite foreseeable, indeed predictable, that he would be sent to some Army base, somewhere, and that he would be in a position to attack the civilian residents of such a base.

Second, I find that the Army, through its enlistment screening process, voluntarily assumed a duty to exclude from the military community those persons, such as Private Gates, whose criminal history made them unfit to serve. This duty was prescribed by statute and by the Army's internal regulations. *See* 10 U.S.C. § 504 (barring convicted felons from enlisting, except by special waiver); Army Regulation AR 601–210 (de-

scribing enlistment screening procedures). Persons such as Ms. Cuttle, who, as a military spouse, was frequently in contact with soldiers, could reasonably be expected to rely on this screening process to exclude violent criminals from military service. By creating such an expectation and then failing to live up to it, the Army unreasonably endangered all members of the military community. *See Cross*, 30 Ill.Dec. at 549–51, 393 N.E.2d at 585–587. ·

Finally, I find that Ms. Cuttle was in a special relationship to the United States Army that is analogous to the relationships which create a special duty to protect against foreseeable third-party crimes under Illinois law. Ms. Cuttle was both an invitee and a tenant of the United States Army on its base in Schweinfurt, to whom the Army owed a duty of reasonable care. *See Ono*, 176 Ill. Dec. at 477, 601 N.E.2d at 1175; *Petrauskas*, 134 Ill.Dec. at 560, 542 N.E.2d at 906. By negligently enlisting Gates, the Army created a substantial likelihood that he would be placed on a residential military base such as Schweinfurt, thus placing persons such as Ms. Cuttle in unreasonable danger of their lives.

For the foregoing reasons, I find that the § 2680(h) does not bar plaintiffs' claims.

## B. *The Foreign Soil Exception*

■ As a second ground for dismissing the complaint, the government contends that at least some of the claims asserted by plaintiff are excluded by the so-called "foreign soil" exception to the FTCA, 28 U.S.C. § 2680(k). In an analogous fashion to § 2680(h), this section excludes from the FTCA waiver "any claim arising in a foreign country." This provision acts to avoid any possibility that the United States would be subject to liability under the laws of a foreign country. *United States v. Spelar*, 338 U.S. 217, 219–221, 70 S.Ct. 10, 11–12, 94 L.Ed. 3 (1949). Accordingly, it only applies where choice of law principles would otherwise require that foreign law govern the cause of action. *Id.* at 221, 70 S.Ct. at 12. Because FTCA actions are governed by the law of the

state in which the negligent act or omission occurred (*Richards v. United States*, 369 U.S. 1, 11, 82 S.Ct. 585, 592, 7 L.Ed.2d 492 (1962)), negligence occurring within the United States but causing damage in a foreign country is not barred by the foreign soil exception. *In re "Agent Orange" Product Liability Litigation*, 580 F.Supp. 1242, 1254 (1984); *Beattie v. United States*, 756 F.2d 91, 96–97 (D.C.Cir.1984); *Leaf v. United States*, 588 F.2d 733, 735 (9th Cir.1978).

Thus, plaintiff's claims in this action may be barred by the foreign soil exception, but only to the extent that she is alleging that the negligence of Army personnel located outside of the United States contributed to Ms. Cuttle's death. Although plaintiff has not alleged any specific acts or omissions by government agents located on foreign soil, the government contends that plaintiffs' allegations that the government was negligent in failing to supervise and control Gates, and to warn and protect Cuttle, must refer to acts in Germany, since any such failures by personnel in the United States would be too remote from Ms. Cuttle's murder to constitute its proximate cause.

In support of its proposition, the government refers to a line of cases in which allegations of United States based negligence, resulting in damage overseas, were rejected under the foreign soil exception. *See Bryson*, 463 F.Supp. at 911–912; *Eaglin v. United States*, 794 F.2d 981 (5th Cir.1986); *Cominotto v. United States*, 802 F.2d 1127, 1130–1131 (9th Cir.1986); *Mohammand v. United States*, No. 90–0444 (D.D.C. July 15, 1992). In each of these cases, the court concluded that any alleged failures to act by Government personnel in the United States were too remote from the harms caused overseas to constitute proximate cause of the plaintiff's damage.

I cannot determine, from the pleadings before me, the particular factual allegations

which the government considers to be precluded by the foreign soil exception. The only specific acts of negligence alleged by the plaintiff involve the failure of Army personnel to detect Gates' criminal history and to prevent him from enlisting in the Army, acts which occurred in the United States. No specific acts have been alleged which would constitute negligent supervision or control of Gates or a failure to warn or protect Ms. Cuttle. To the extent that any such acts or omissions are presented to this Court after discovery, they will of course be excluded if they occurred on foreign soil. If, however, they were located in United States territory, I will have to make a determination at that time as to whether they are sufficiently proximate to Ms. Cuttle's damages to support a cause of action.

### C. *Discretionary Function Exception*

■ A final basis proffered by the government for barring Ms. Cuttle's claims is the "discretionary function" exception to the FTCA. 28 U.S.C. § 2680(a).[4] Under this exception, the actions of government employees are immunized from tort attack when they entail the exercise of discretion informed by public policy. *United States v. Gaubert*, 499 U.S. 315, 324–326, 111 S.Ct. 1267, 1274–75, 113 L.Ed.2d 335 (1991).

The government contends that this exception bars any claims relating to the Army's negligence in supervising or controlling Gates once he was enlisted, and any failure to protect or warn Ms. Cuttle about Gates' dangerous nature.[5] According to the government, no statute or Army regulation requires the government to supervise or control Gates in any particular fashion, nor was there any mandatory requirement that the Army take any particular steps to protect or warn Ms. Cuttle. Thus, the government concludes, taking any of the actions contemplated by plaintiff's allegations would have required an exercise of discretion on the part of Army commanders, taking into account such factors

---

4. This section provides, in relevant part, that the FTCA waiver of immunity shall not apply to any claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the government, whether or not the discretion involved be abused."

5. The government does not contend that this exception bars plaintiff's claim with respect Gates' original enlistment, apparently conceding that it had no discretion in failing to properly investigate his criminal history.

as the operational needs of the Army, the appropriate allocation of military resources, and the possibility of engendering fear among Army base personnel.

Plaintiff responds that because Gates' recruitment was unlawful, he was never legally a member of the armed forces and therefore the Army had no discretion in dealing with him. In the alternative plaintiff argues that government agents never actually exercised discretion in their failure to supervise Gates or protect Cuttle, and thus the exception should not apply.

■ With respect to plaintiff's first contention, the law is clear that an enlistment premised on false statements by an enlistee, which disguise his ineligibility for. service, is not void *ab initio,* but is merely voidable at the discretion of the Army. *United States v. Grimley,* 137 U.S. 147, 11 S.Ct. 54, 34 L.Ed. 636 (1890); *United States v. Locke,* 4 M.J. 714 (N.C.M.R.1977). Thus, even though Gates' enlistment was apparently unlawful, he was, in fact, a soldier at all relevant times.

The second point raised by the plaintiff is less easily disposed of. In *Dube v. Pittsburgh Corning,* 870 F.2d 790, 796–797 (1st Cir.1989), the court held that the discretionary function exception was only available to the government where a government employee did, in fact, exercise discretion in acting or failing to act. The court reasoned that § 2680(a) was intended to protect government officials' policy decisions from tort attack in the courts, but did not shield government actors who negligently failed to address a problem at all, even if they would have had discretion upon doing so. *Id.* Thus, if the choice being challenged was not, in fact, a "policy judgment," the court reasoned that § 2680(a) did not apply. *Id.*

The government asserts that *Dube* was effectively overruled by the Supreme Court's subsequent decision in *Gaubert.* In that case, government banking officials, who had placed a bank into receivership, were sued for alleged negligence in their subsequent management and supervision of its operations. The principal issue in the case was whether the discretionary function exception applied to the "operational" activities of bank officials in their day-to-day management of the bank. Some earlier cases had suggested that a distinction be drawn between planning decisions which were within the exception and operational decisions which were not. *See, e.g. Dalehite v. United States,* 346 U.S. 15, 42, 73 S.Ct. 956, 971, 97 L.Ed. 1427 (1953).

The court held that the planning/operational dichotomy was not the appropriate framework in which to analyze the discretionary function exception. Rather, the court held that "the focus of the inquiry is ... on the nature of the actions taken and on whether they are susceptible to policy analysis." *Gaubert,* 499 U.S. at 325, 111 S.Ct. at 1275. Based on this language, the government now contends that it matters not whether discretion played a role in the challenged decision, so long as it might have.

As with my analysis of the government's "foreign soil" arguments, I am hampered here by a lack of specific allegations concerning the failures to warn, protect, supervise and control, of which the plaintiff has accused the Army. I do note, however, that there is no allegation that any Army personnel with authority over Gates after his enlistment and training were ever aware, or had reason to be aware, of his dangerous propensities. The same can be said of Army personnel who were in a position to warn or protect Ms. Cuttle. It would thus appear that any wrongful failure by the Army in any of these regards was simply the result of the still active negligence of the Army recruiters and trainers (in Chicago and at Fort Knox), who failed in their duty from the start to properly investigate Gates in the first instance.

In any event, there are currently no specific factual allegations before me which could be construed as a claim that Army personnel were negligent in the exercise of a discretionary act. Should such evidence be developed before trial, the government is free to request its exclusion at a latter date.

## V. CONCLUSION

For the foregoing reasons, defendant's Motion to Dismiss the Complaint is **DENIED.**

**SO ORDERED.**