**Mary F. MULLOY, as Administratrix of the Estate of Carol Mulloy Cuttle, Plaintiff,**

v.

**UNITED STATES, Defendant.**

**Civil Action 93–11716–NG.**

United States District Court, D. Massachusetts.

Aug. 30, 1996.

Robert W. Thuotte, Witmer & Associates, Boston, MA, for plaintiff.

Phyllis J. Pyles, Steven K. Forjohn, Robin D. Smith, Washington, DC, James F. McConnon, Jr., Torts Branch, Civil Division

U.S. Department of Justice, Washington, DC, Sara M. Bloom, U.S. Atty's Office, Boston, MA, for defendant.

### MEMORANDUM AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

GERTNER, District Judge.

## I. INTRODUCTION

On November 29, 1990, Carol Cuttle was kidnapped from a parking lot at Conn Barracks, a United States Army installation at Schweinfurt, Germany. Ms. Cuttle, who lived in a nearby town with her husband, an Army captain, was subsequently taken to another location, where she was beaten, raped, robbed and ultimately strangled to death. The perpetrator of this crime was one Private Dwan Gates, who later confessed to the offense and was sentenced by a general court martial to life imprisonment.

An investigation by the United States Army Inspector General (IG) subsequently determined that, at the time he had enlisted in the Army, Private Gates had had an extensive criminal record, including a previous rape conviction. The IG's investigation further determined that the Army personnel involved in Gates' recruitment and enlistment had failed properly to investigate his criminal background, and thus had not discovered Gates' criminal past. Had this past been discovered, Gates would have been excluded by law and Army policy from enlisting in the Army.

The plaintiff, the administratrix of Ms. Cuttle's estate, brought this action under the Federal Tort Claims Act, 28 U.S.C. § 1346(b) ("FTCA"), charging that the negligence of the United States was the proximate cause of Ms. Cuttle's rape and murder. Plaintiff contends that the United States breached a duty to Ms. Cuttle when the Army failed to investigate Gates' criminal background prior to his enlistment, when it failed to prevent him from coming into contact with her subsequent to his enlistment, and when it failed to warn her of his violent tendencies.

The United States moved to dismiss the complaint, claiming that plaintiff's claims were barred by various exceptions to the FTCA, which prohibit claims arising out of assault and battery, claims arising on foreign soil, or claims arising from the exercise of discretion by government officials. 28 U.S.C. §§ 2680(a), (h), (k). By memorandum dated March 31, 1995, I denied the United States' motion. I found that to the extent plaintiffs' claim was based on the negligence of Army recruiters in failing to follow mandatory recruitment procedures, it arose neither from an assault and battery, on foreign soil, nor as the result of a discretionary act. See *Mulloy v. United States*, 884 F.Supp. 622, 626–631, 632–634 (D.Mass.1995).

I further concluded that plaintiff stated a cause of action under Illinois law.[1] I found that, under certain circumstances, Illinois imposed a duty on certain individuals to protect others from the unlawful acts of third parties, and that such a duty arose under the circumstances alleged by plaintiff. *Mulloy*, 884 F.Supp. at 631–632.

The United States now moves for summary judgment. It asks that I revisit my conclusion that it owed a duty toward plaintiff's decedent. It further contends that the rape and murder of Ms. Cuttle was not proximately caused by the negligence of Army recruiters. For the following reasons, the United States' motion is **DENIED**.

## II. FACTS

### A. Carol Cuttle's Relation to the Military Community at Schweinfurt

The facts are set forth below in the light most favorable to the plaintiff. *Santiago–Ramirez v. Secretary of Department of Defense*, 62 F.3d 445, 446 (1st Cir.1995).

Carol and Mark Cuttle were married on September 1, 1990, in Fitchburg, Massachusetts. Mark Cuttle was, at the time, a captain in the United States Army and was stationed at Conn Barracks in Schweinfurt, Germany. After a honeymoon in Greece, the couple took up residence in Mechenried–

---

1. The United States is liable under the FTCA only "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).

Riedbach, Germany, a town about 20 miles from Conn Barracks. Shortly thereafter, Captain Cuttle applied for and received a "Uniformed Services Identification and Privilege Card," which Ms. Cuttle could use to gain admittance to Conn Barracks. Captain Cuttle also enrolled Ms. Cuttle in the medical care program for military dependents.

Prior to and after their arrival in Germany, Captain Cuttle provided his wife with various publications describing her role as an officer's wife and a member of the military community. One book, entitled "The Officer's Family Social Guide," described various military customs and protocols, and the duties of an officers' wife. Another book, entitled "Ruffles and Flourishes, A Guide to Customs and Courtesies of the Military," described in great detail how officers' wives were to behave at military functions, even to the point of prescribing a protocol for pouring coffee and tea.[2]

Ms. Cuttle also received from the Army a copy of the "Schweinfurt Military Community Information Guide," which outlined the range of services available to members of the community, including various retail businesses, medical services, legal services, recreation, a community newspaper, a social services agency, and the like. Other publications distributed to Ms. Cuttle detailed educational offerings for military families at Schweinfurt.

Upon Ms. Cuttle's arrival in Germany in September of 1990, she quickly became an active member of the military community in Schweinfurt. She was introduced at a reception, after attending a brigade change of command ceremony. A few days later, she attended a brunch for company grade officers and their wives at the home of a lieutenant colonel. She also attended "family day," a battalion-level family picnic where she was introduced to the soldiers under Captain Cuttle's command, as well as to their spouses and children.

Also in September, Ms. Cuttle attended her first "Hail and Farewell," a monthly event for new members arriving in the community and those who were departing. She was formally welcomed at this event by her husband's battalion and presented with a gift. She obtained an Army issued driver's license, library card and officers' club membership.

In the subsequent months, and in fulfillment of her duties as an officer's wife, Ms. Cuttle attended numerous "coffees," "teas," luncheons and dinners at Conn Barracks. She joined the German–American Club, attended additional Hails and Farewells, and participated in a two-day, comprehensive orientation for new family members of the community. She and her husband also gave a Halloween party for the children of his soldiers.

In August of 1990, Iraq invaded Kuwait, and United States forces in Europe were mobilized in anticipation of Operation Desert Shield. Captain Cuttle received orders deploying him to Grafenwohr Training Area for maneuvers. Shortly before Captain Cuttle's departure, his battalion commander asked that all company commanders and their spouses attend a briefing concerning the planned deployment. The meeting was intended to address rumors about the deployment, and to enlist the ongoing assistance of those in attendance in helping families prepare for the impending separation of soldiers from their loved ones. He commended the Family Support Group, in which Ms. Cuttle played an active role, for its leadership in this regard.

After her husband's departure, Ms. Cuttle continued to participate in the life of the Schweinfurt military community, attending luncheons and "coffees," and performing some volunteer work for the Army Exceptional Family Member program. On Thanksgiving, a week before her death, Ms. Cuttle and other officer's wives served dinner in the Mess Hall to the soldiers who had not been deployed and to the community's families. During that time, Ms. Cuttle's brother had offered her a free plane ticket back to the United States. Ms. Cuttle declined to

---

**2.** According to this book, coffee "outranks" tea, while tea "outranks" punch. The wife of the highest ranking officer is thus entitled to pour the coffee, while the second ranking spouse pours the tea, and so forth.

accept it, deciding instead to remain in Germany because she felt a sense of obligation to stay at Schweinfurt and take part in the social support network for military families there.

### B. *The Rape and Murder of Carol Cuttle*

On November 29, 1990, Carol Cuttle joined a friend, Jane Oliver, to drive to Wuerzburg, Germany in Ms. Cuttle's vehicle. Upon their return that evening, Ms. Cuttle drove to Conn Barracks to drop off Ms. Oliver at the Barracks' Education Center, where she was taking a class. After leaving Ms. Oliver, Ms. Cuttle drove to a "shoppette" located in the Finney Recreation Center on Conn Barracks. She parked her car in the rear of the complex next to the closest entrance for the shoppette. It was dark at the time.

After purchasing a candy bar at the shoppette, Ms. Cuttle returned to her car. Private Gates had seen Ms. Cuttle leave the shoppette and followed her to her car. There he confronted her and forced his way into the car. He grabbed Ms. Cuttle by the hair and punched her in the face causing a severe injury to her left eye. She was very frightened and begged him not to hurt her. There were no people around to offer help.

Gates then forced Ms. Cuttle to drive off the base to the rear of some buildings in the town of Schweinfurt. There he forcibly raped her and strangled her with his bare hands. After stealing Ms. Cuttle's wedding band and engagement ring, he fled.

### C. *Private Gates' Enlistment*

The facts relating to Private Gates' enlistment are largely undisputed and derive primarily from the IG's report dated September 8, 1992. As described in greater detail in my March 31, 1995 memorandum, see *Mulloy*, 884 F.Supp. at 624–626, the IG found that Private Gates had been permitted to enlist in the Army in May of 1990 despite his having an extensive criminal record which made him ineligible for enlistment. He was first arrested on January 22, 1986 for purse snatching, and was placed on juvenile supervision. On April 20, 1987, Gates was convicted as a juvenile of aggravated burglary and rape.

On April 29, 1987, Gates was convicted as an adult of a subsequent aggravated burglary and theft. On September 26, 1989, Gates was convicted of unlawful use of a weapon. Gates was still on probation on the weapon charge at the time he enlisted.

Under Army regulations, Gates was ineligible for enlistment because he was on probation. More significantly, 10 U.S.C. § 504 provides that "no person who ... has been convicted of a felony, may be enlisted in any armed force. However, the Secretary concerned may authorize exceptions, in meritorious cases, for the enlistment of ... person convicted of felonies." Nevertheless, because Gates had been convicted of two or more felonies, Army policy prohibited a waiver in his case. Thus, Gates' multiple felony convictions stood as a legal barrier to his ever becoming a soldier.

It is also clear from the IG's report that, had the Army recruitment personnel followed proper procedures, Private Gates' ineligibility for enlistment would have been readily discovered, and the rape and murder of Ms. Cuttle would have never occurred. According to the IG's report, six recruiting experts "clearly opined that had any one person involved with PVT Gates' enlistment process complied with established policies, regulatory guidance, proper procedures, and accepted recruiting practices, PVT Gates' ineligibility for enlistment into the U.S. Army would have been readily disclosed." (IG's Report at 24).

Three instances of apparent negligence stand out as particularly significant. First, there is evidence suggesting that when Gates was interviewed by his recruiter at the time of his enlistment, he volunteered that he had a juvenile record but was told by his recruiter "I'm not worried about any juvenile convictions." Accordingly, Gates did not advise his recruiter of his juvenile convictions, including the rape conviction central to this case. (Testimony of Dwan Gates, March 12, 1992, Exhibit 4 to Plaintiff's Opposition to Defendant's Motion for Summary Judgment).

Moreover, Gates' recruiters failed to investigate a glaring inconsistency in the personal data which Gates provided them at the time

of his enlistment—an inconsistency which, if investigated, would have revealed the existence of Gates' criminal history. As part of Army enlistment procedures, Gates was required to complete a United States Army Recruiting Command Form 200–C, which required him to provide various items of biographical data. Question 24 on Form 200–C asked for a listing of "all high schools and colleges attended." Gates stated that he had attended "Lawrence Gardner High School" in Kansas from September, 1984 through June, 1986, and National Technical College from August, 1986 to November, 1989. Although Gates claimed to have graduated from Lawrence Gardner High School, he provided no explanation of why he only attended for two years, and did not indicate that he had attended any other high school. Had recruiters investigated the circumstances of Gates' attendance at Lawrence Gardner High School, they would have discovered that it was a school serving juveniles incarcerated by the State of Kansas.

The final major instance of apparent negligence involved the Army's handling of its own investigation of Gates' criminal history. The Army utilizes a system called "Entrance National Agency Check" (ENTNAC) to screen potential enlistees with criminal backgrounds. ENTNACs are performed by the Defense Investigative Service (DIS), which checks national crime databases to determine whether the potential enlistee has a criminal history and provides the results to Army recruiters.

In Gates' case, he was permitted to enlist before his recruitment station requested an ENTNAC from DIS. The recruitment station requested an ENTNAC on Gates a few days later, and it took approximately two weeks for DIS to complete it. Upon completion, DIS advised Gates' recruitment station that its investigation had revealed a possible match, indicating that Gates might have a criminal record.

By that time, however, Gates had already been authorized to begin basic training at Fort Knox. Under these circumstances, Army regulations required personnel at Gates' recruitment station to forward the ENTNAC results to Fort Knox for further processing. They failed to do so. Personnel at Fort Knox were also required to request from the recruiting station Gates' ENTNAC results. This was not done either. Thus, the Army ultimately permitted Gates to complete basic training and to be deployed to Germany without his criminal background ever having been properly scrutinized by the Army personnel responsible for his enlistment and training.

## III. DISCUSSION

### A. *Summary Judgment Standard*

A motion for summary judgment will be granted when all the relevant pleadings, viewed in the light most favorable to the nonmoving party, present no genuine issue of material fact such that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Aponte–Santiago v. Lopez–Rivera,* 957 F.2d 40, 41 (1st Cir.1992); *Medina–Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.1990); *Griggs–Ryan v. Smith,* 904 F.2d 112, 115 (1st Cir. 1990).

### B. *Source of Law*

Under the FTCA, the United States is liable "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). The parties have conceded, for the purposes of this motion, that Illinois law governs plaintiff's claim.

### C. *Elements of Negligence under Illinois Law*

■ The United States correctly asserts that the mere existence of a federal statute or regulation does not necessarily create a duty on the part of the United States to third-persons. Neither does the violation of such a statute or regulation by federal employees necessarily constitute actionable misconduct under the FTCA. *Attallah v. United States,* 955 F.2d 776, 785, n. 15 (1st Cir. 1992); *Zabala Clemente v. United States,* 567 F.2d 1140, 1149 (1st Cir.1977).

 Rather, to make out a claim under the FTCA, plaintiff must prove all of the elements of negligence under Illinois law. She must prove 1) that the United States owed a duty to the decedent, Ms. Cuttle, 2) that the United States breached that duty, and 3) that Ms. Cuttle's injuries were proximately caused by that breach. *Cunis v. Brennan,* 56 Ill.2d 372, 308 N.E.2d 617, 618 (1974). Whether the United States owed a duty to Ms. Cuttle in this case is a question of law for determination by the court. *Id.*

### D. *The United States' Duty to Ms. Cuttle*

The United States contends that it had no duty to protect Ms. Cuttle from the off-duty criminal acts of Private Gates, and therefore cannot be held liable for her death notwithstanding the Army's obvious negligence in recruiting him. I disagree. Upon review of the facts of this case, I find that under Illinois law, the United States owed Ms. Cuttle a duty in at least three respects: a duty not to hire unreasonably dangerous employees, a special duty to protect business invitees from reasonably foreseeable criminal acts, and a duty to perform its voluntarily undertaken recruitment screening procedures with due care.

### 1. *Negligent Hiring*

 Under Illinois law, employers are not directly liable for the acts of their employees who are acting outside of the scope of their apparent authority. *Harrison v. Dean Witter Reynolds, Inc.,* 974 F.2d 873, 883–884 (7th Cir.1992), *cert. denied,* 509 U.S. 904, 113 S.Ct. 2994, 125 L.Ed.2d 688 (1993). However, Illinois does recognize that under certain circumstances, "an employer is liable for hiring and retaining unfit and incompetent employees .. where there has been an intentional tort or criminal conduct by the employee," *Martin v. Yellow Cab Co.,* 208 Ill.App.3d 572, 153 Ill.Dec. 503, 508, 567 N.E.2d 461, 466 (1990), and where the employer "knew, or should have known [the employee] was unfit for the position to be filled." *Easley v. Apollo Detective Agency, Inc.,* 69 Ill.App.3d 920, 26 Ill.Dec. 313, 320, 387 N.E.2d 1241, 1248 (1979). Put another way, an employer has a duty to refrain from "hiring or retaining an employee who is a threat to third persons to whom the employee is exposed." *Bates v. Doria,* 150 Ill. App.3d 1025, 104 Ill.Dec. 191, 195, 502 N.E.2d 454, 458 (1986).

 At the same time, an employer does not have a duty to assure all persons that its employees will not injure them at any time, whether on the job or off. *Bates,* 104 Ill.Dec. at 196, 502 N.E.2d at 459. Rather, there must be a "demonstrated connection between the [decedent's] injuries and the fact of employment." *Id.* Thus the employer's duty to protect against dangerous employees extends only to those individuals who are exposed to its employees precisely because of their employment.

 In the instant case, the United States enlisted into the Army an individual, Dwan Gates, who, by its own admission, was unfit to serve. Service in the modern Army, particularly service overseas, is not like ordinary employment at a nine to five domestic job. The Army, as the facts at this stage suggest, strongly encourages—indeed exhorts—its personnel and their families to use the base facilities for all their needs and to become active participants in an insular community within the foreign country.[3] The United

---

3. The sociologist, Erving Goffman, used the phrase "total institution" to describe what he called the "encompassing tendencies" of certain institutions. Goffman, *Asylums: Essays on the Social Situation of Mental Patients and Other Inmates* (1961). For example, some total institutions are created to care for a certain category of individuals, like the blind or disabled; others are organized to pursue a given task, "justifying themselves only on these instrumental grounds," like an Army barracks or work camp. *Id.* at 4–5. Some may have physical barriers like high walls, insulating the community from those outside, others may have less imposing barriers. These are institutions, according to Goffman, in which "all aspects of life are conducted in the same place and under the same single authority"; each phase of a member's activities is carried out in the immediate company of others, typically required to do the same thing; all phases of daily life are tightly scheduled, with the order imposed from above; the various activities are organized in order to enforce a rational overall plan of the institution. *Id.* at 6.

While, to be sure, Goffman's concept does not exactly fit the Conn barracks in Schweinfurt,

States therefore had a duty not to hire Gates if, as a result of its actions in defining the job of soldier, serving overseas in peace-time, it knew or should have known that Gates was a threat to other persons with whom he would have come into contact because he was a soldier.[4]

## 2. *Special Relationship*

An additional source of duty is the existence of a "special relationship" between the United States and decedent. *See Harrison*, 974 F.2d at 884–885; *Figueroa v. Evangelical Covenant Church*, 879 F.2d 1427, 1430 (7th Cir.1989); *Jackson v. Shell Oil Co.*, 272 Ill.App.3d 542, 208 Ill.Dec. 958, 961, 650 N.E.2d 652, 655 (1995). When a special relationship exists, it imposes on the defendant a duty of reasonable care to protect the beneficiary of that duty against criminal attacks by third parties. Among the special relationships recognized by Illinois law is that of a possessor of land to its invitees. *Fancil v. Q.S.E. Foods, Inc.*, 60 Ill.2d 552, 328 N.E.2d 538, 541 (1975).[5] A person is an invitee if she (1) enters the premises of another by express or implied invitation; (2) her entry is connected with the owner's business or with an activity the owner conducts or permits to be conducted on his land; and (3) there is a mutuality of benefit or a benefit to the owner. *Figueroa v. Evangelical Covenant Church*, 879 F.2d 1427, 1431 (7th Cir.1989).

The United States concedes that Ms. Cuttle was an invitee of the United States at the time of her abduction by Private Gates. (United States' Reply Memorandum of Law in Support of its Motion for Summary Judgment at 13). Thus, under Illinois law, the United States owed Ms. Cuttle a duty, to the extent she was a business invitee, to protect her from reasonably foreseeable criminal attacks by others.[6] *Figueroa*, 879 F.2d at 1430.

## 3. *Voluntary Undertaking*

A final source of the United States' duty towards Ms. Cuttle is the Army's voluntary assumption of a duty to protect members of the military community by screening convicted felons from entrance into the Armed Forces. Illinois courts have held that, "one who gratuitously renders services to another is subject to liability for bodily harm caused to the other by his failure, while so doing, to exercise such competence and skill as he possesses." *Nelson v. Union Wire Rope Corp.*, 31 Ill.2d 69, 199 N.E.2d 769, 774 (1964).

In *Nelson*, the Illinois Supreme Court determined whether and how, "liability can arise from the negligent performance of a voluntary undertaking." *Id.* 199 N.E.2d at 773.[7] *Nelson* involved a claim that the defen-

which is operated in a far, far less rigid way and is less isolated than Goffman's typology suggests. Nevertheless, there are similarities between the two which are useful to this analysis.

4. I agree with the United States that the evidence does not support a distinct claim for "negligent facilitation." Negligent facilitation refers to negligent conduct by the defendant which facilitates the commission of wrongful conduct by a third person. *Mims v. New York Life Insurance Co.*, 133 Ill.App.2d 283, 273 N.E.2d 186 (1971) (landlord's agent left door unlocked and ajar, allowing entry by thief). To the extent the United States facilitated Gates' rape and murder of Ms. Cuttle, it was through its negligent hiring of Gates in the first instance. The moniker "negligent facilitation" adds nothing to the analysis.

5. Illinois has, since *Fancil*, abolished the distinction between "invitees" and "licensees" with regard to liability for negligence. By statute, possessors of land now owe all entrants a duty "of reasonable care under the circumstances regarding the state of the premises or acts done or omitted on them." 740 Ill.St.Ann. 130/2. This

change did not significantly alter the duty of landowners to invitees. *Ward v. Kmart Corp.*, 136 Ill.2d 132, 143 Ill.Dec. 288, 292, 554 N.E.2d 223, 227 (1990).

6. Because I find that the United States owed Ms. Cuttle a duty of care by dint of her special relationship to the United States as a business invitee, I need not consider whether such duty might also arise from any other "special relationship." In particular, I need not determine whether, as plaintiff urges, any duty arises out of Ms. Cuttle's "special relationship" to the United States as a member of the military community at Schweinfurt. *See* Restatement (Second) of Torts § 314A, caveat (describing special relationships as declining to express a position as to whether other, unspecified, special relationships might exist).

7. The *Nelson* case purported to decide Florida law, but it has subsequently been recognized as a statement of Illinois law as well. *See Pippin v. Chicago Housing Authority*, 78 Ill.2d 204, 35

dant's failure to inspect a hoist, which it had voluntarily undertaken to do, resulted in the deaths of several workmen when their work platform, supported by the hoist on the outside of a building, fell to the ground. The Court noted that Illinois had adopted the doctrine that "one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all." *Id.* The Court went on to determine whether this duty applied only to "active negligence" (i.e. creating an additional danger), or whether it also applied to negligence arising out of a mere failure to act—in this case the defendant's failure to inspect the hoist. After reviewing cases from numerous jurisdictions, the Court concluded that the defendant's voluntary undertaking to inspect the hoist imposed on it a duty to perform the inspection with due care, and that its failure to do so was a sufficient basis for liability. *Nelson,* 199 N.E.2d at 778. Moreover, the Court concluded that plaintiffs need not prove that they relied upon the inspections. *Nelson,* 199 N.E.2d at 779.

Since *Nelson,* the Illinois courts have repeatedly affirmed the principle that "one who gratuitously renders services to another is subject to liability for bodily harm caused to the other by his failure, while so doing, to exercise such competence and skill as he possesses." *Phillips v. Chicago Housing Authority,* 89 Ill.2d 122, 59 Ill.Dec. 281, 284, 431 N.E.2d 1038, 1041 (1982). *See also Pippin v. Chicago Housing Authority,* 78 Ill.2d 204, 35 Ill.Dec. 530, 533, 399 N.E.2d 596, 599 (1979). There is no need to prove that the plaintiff was left in a worse position than if there had been no voluntary undertaking at all. *Phillips,* 59 Ill.Dec. at 283–284, 431 N.E.2d at 1040–1041. Nor is it necessary to show that the plaintiff relied on the defendant's undertaking. *Figueroa,* 879 F.2d at 1435. Rather, the duty "extends to such persons as defendant could reasonably have foreseen would be endangered as the result of negligent performance." *Id.*

In the instant case, the United States voluntarily undertook to screen convicted felons from enlistment in the Armed Forces. It established an elaborate regulatory regime, with numerous redundant checks, to insure that individuals such as Dwan Gates were not placed in a serviceman's position of trust and responsibility, encouraged to spend time on military bases and given access denied others. It had a duty to "exercise due care or such competence and skill as [it] possess[ed]" in screening felons from among potential enlistees. *See Frye v. Medicare–Glaser Corp.,* 153 Ill.2d 26, 178 Ill.Dec. 763, 766, 605 N.E.2d 557, 560 (1992). Its duty to Ms. Cuttle extended to the full measure of that undertaking. *Phillips,* 59 Ill.Dec. at 283, 431 N.E.2d at 1040.

The United States protests that the purpose of this screening process is to further "the Army's interest in maintaining good order and discipline within the military ranks, the Army's interest in accessing only those soldiers most likely to complete their enlistments, and the Army's interest in eliminating the long-held erroneous perception that the Army is an alternative to the civilian criminal justice system." The United States further contends that Army recruiting standards "were never intended to provide a guarantee of safety or a system of protection to all persons who purposefully or inadvertently come into contact with Army soldiers on or off Army installations."

Illinois law does not, however, require that the voluntary undertaking be done with any specific intent to benefit the plaintiff. *See, e.g. Phillips,* 59 Ill.Dec. at 283, 431 N.E.2d at 1040 (housing authority undertook security measures to prevent crime and safeguard tenants, not to benefit any particular tenant). The plaintiff need only show that services were "voluntarily rendered" to Ms. Cuttle, and that it was reasonably foreseeable that the decedent would be injured by the Army's negligent performance of its voluntary undertaking. *Nelson,* 199 N.E.2d at 779.

As noted above, the evidence in this case supports the conclusion that the Army is not like an ordinary employer whose obli-

gations to its customers, even as to services it voluntarily undertakes, may be limited. In this military community, Ms. Cuttle was hardly a person "who purposefully or inadvertently [came] into contact with Army soldiers." Rather, as an officer's wife, Ms. Cuttle was expected to play an integral role in the life of the Schweinfurt military community, a role which included regular contact, on United States property, with soldiers, both in and out of uniform. Ms. Cuttle's involvement with these soldiers, and the auxiliary services she helped to provide, served to further the Army's own goals of maintaining morale and unit loyalty and in making an Army career more attractive to soldiers with families.[8] The United States' admitted goal of promoting "good discipline" rendered an obvious benefit to Ms. Cuttle, as it did to all those who were expected to work with soldiers on a regular basis. As such, the record suggests that Ms. Cuttle was among the class of persons to whom the Army rendered a benefit when it undertook to screen convicted felons from enlistment. The Army cannot have it both ways. It cannot seek to maximize Ms. Cuttle's commitment to the overseas Army community and then disclaim all responsibility when she did what they suggested.

The United States undertook to screen convicted felons from the Army. Under Illinois law, the United States had a duty to exercise its undertaking with reasonable care, and owed this duty to "such persons as defendant could reasonably have foreseen would be endangered as the result of negligent performance." *Nelson,* 199 N.E.2d at 779. I find that it was clearly foreseeable that Ms. Cuttle, a serviceman's wife who was encouraged to spend significant amounts of time on a secure military facility and to interact with soldiers on a regular basis, would be endangered by the admission, into the military community, of a convicted rapist and multiple felon.[9]

---

8. Indeed, the Army has explicitly recognized the role played by Army family members in furthering the Army's mission. "The Army Family Action Plan XI", Department of the Army Circular 608–94–1 (January 31, 1994), describes the "Army Family Philosophy" with the following language: "A partnership exists between the Army and Army Families. The Army's unique missions, concept of service and lifestyle of its members—all affect the nature of this partnership. Towards the goal of building a strong partnership, the Army remains committed to assuring adequate support to families to promote wellness; develop a sense of community; and strengthen the mutually reinforcing bonds between the Army and its families." *Id.* at p. 33.

Moreover, "[t]his partnership must center on a genuine sense of 'the Army Community' with all members offered the challenge and opportunity to work together for the common good. We must take care not to misinterpret the age-old slogan, 'The Army takes care of its own.' This is not a promise for the institution to provide all of the individual and group support requirements— to make the members of the community dependent upon the institution and the federally funded support structure. Rather the slogan is a challenge for all of us in 'the Army Community' to work together, as equal partners, applying our talents, skills, creativity and time to taking care of our own and improving the community as a whole. Each of us has a special responsibility as a member of this worldwide community to work to make it a better place. This is not at all dissimilar from our responsibility toward the civilian communities in which we often live: you get out of the community what you put into it; if you want it to be better or more responsive you have to be willing to make a personal investment and commitment to it." *Id.*

9. *Cf. Haddock v. City of New York,* 75 N.Y.2d 478, 554 N.Y.S.2d 439, 553 N.E.2d 987 (1990). The facts in *Haddock* are remarkably similar to those in the instant case. In *Haddock,* the plaintiff was a child who had been raped by a park employee in a park operated by the City of New York. The employee had been hired seven months earlier and, pursuant to City personnel rules, had been subject to a mandatory criminal background check. Although the employee denied having a criminal background, the City's own independent check of his record revealed a long history of violent crime and other felonies. While the violent felonies (including an attempted rape) had occurred 30 years earlier, the employee had been released from prison only weeks before his employment with the City, after serving time for violating his parole following a lengthy prior incarceration. As in the instant case, the City permitted the employee to commence work before receiving the result of the background check, and failed to reconsider its decision when his criminal background became known.

The Court upheld a jury verdict, finding the City negligent in its hiring and retention of the employee. Although the City had the discretion to hire convicted felons in appropriate circumstances (as did the Army in the instant case), it never exercised that discretion because it never followed its own rules for investigating the criminal background of the employee in question.

### E. Breach of Duty and Proximate Cause

■■■■■ Since I have determined that the United States owed a duty to Ms. Cuttle under negligent employment, special relationship, and voluntary undertaking theories, I must now determine whether the evidence supports a finding that the United States breached those duties so as to have proximately caused Ms. Cuttle's injuries. Under Illinois law, an injury is said to be proximately caused by a negligent act or omission if it is the "natural and probable result of the negligent act or omission and be of such a character as an ordinarily prudent person ought to have foreseen as likely to occur as a result of the negligence, although it is not essential that the person ought to have foreseen the precise injury which resulted from the act." *Neering v. Illinois Cent. R. Co.*, 383 Ill. 366, 50 N.E.2d 497, 503 (1943); *Davis v. Marathon Oil Co.*, 64 Ill.2d 380, 1 Ill.Dec. 93, 100, 356 N.E.2d 93, 100 (1976). "The intervention of independent concurrent or intervening forces will not break causal connection if the intervention of such forces was itself probable or foreseeable." *Id.*

#### 1. Negligent Hiring

■■■ To establish a claim under a negligent hiring theory, plaintiff must show that the United States breached its duty to refrain from "hiring or retaining an employee who is a threat to third persons to whom the employee is exposed." *Bates,* 104 Ill.Dec. at 195, 502 N.E.2d at 458. The plaintiff must also show a "demonstrated connection between the [decedent's] injuries and the fact of employment." *Id.*

■■■ The record evidence is clearly sufficient for a trier of fact to conclude that the United States breached its duty to exercise due care in this regard. The Army hired as a soldier—i.e., an individual who would be placed in highly sensitive positions requiring trust and discipline, would be provided with lethal weaponry, and would be permitted entry to secure residential military facilities—an individual who was not only a convicted rapist, but one who was an unrehabilitated repeat offender who had been convicted of a felony less than 12 months prior to his enlistment in the Army.

Gates had advised his Army recruiter that he had a juvenile record (a record which included his rape conviction) (IG Report at 12), but was told that the Army was only interested in his adult convictions. He therefore did not reveal his juvenile rape conviction.

Moreover, the Army had actual notice that Gates likely had a criminal background when it received the results of his ENTNAC, and constructive notice of this background when Gates advised his recruiter that he had attended a high school which, in fact, was attended by incarcerated youths. Not only were the responses of Army personnel inconsistent with its own recruiting regulations, I conclude that its failure to further investigate Gates' criminal record—after receiving multiple indications that he had one—is a sufficient basis to find that the Army breached its duty to refrain from hiring an employee that it "knew or should have known" was a threat to third persons to whom he might be exposed.[10] *See Easley,* 26 Ill.Dec. at 320, 387 N.E.2d at 1248.

■■■ Moreover, the record also supports a finding that Ms. Cuttle's injuries were proximately caused by Gates' employment by the Army. Had Gates not been permitted to enlist in the Army, he would not have been at the Conn Barracks on the night of Ms. Cuttle's abduction and murder. Although Gates

---

The Court concluded that the City's utter failure to follow its own procedures was a sufficient breach of duty to sustain the jury's negligence verdict. *Haddock,* 75 N.Y.2d at 484–486, 554 N.Y.S.2d 439, 553 N.E.2d 987.

**10.** Since the evidence supports a finding that the Army had at least constructive notice of Gates' criminal background, I need not decide whether the exercise of due care required the Army to affirmatively investigate the criminal back-

grounds of potential enlistees. *Compare Ponticas v. K.M.S. Investments,* 331 N.W.2d 907 (Minn. 1983) (negligence for apartment owner to fail to investigate criminal background of apartment manager who subsequently sexually assaulted tenant) *with Garcia v. Duffy,* 492 So.2d 435 (Fla. App.1986) (employer had no duty to affirmatively investigate criminal history of truck driver who assaulted plaintiff on public street, where employer had no actual or constructive notice of driver's criminal background).

was not on duty at the time of his attack on Ms. Cuttle, he was in a restricted area to which he had access solely because of his employment status. Thus, there is a demonstrated connection between the attack and the fact of his employment.[11] *Bates,* 104 Ill.Dec. at 196, 502 N.E.2d at 459.

To be sure, had Gates not been a soldier, he might have committed the same crime against some other victim on a public street. But this is the case in any negligent hiring scenario. For example, in *Tatham v. Wabash R. Co.,* 412 Ill. 568, 107 N.E.2d 735 (1952), the Court found that the plaintiff stated a cause of action where he was beaten by a fellow employee who his employer knew to be "a vicious, contentious, pugnacious and ill-tempered person who was quarrelsome and frequently engaged in physical combats." *Id.* 107 N.E.2d at 735. Clearly the employee in question could have beaten the plaintiff

even if he had not been so employed, but his employment by the defendant made this event much more likely, and placed the plaintiff in unreasonable danger. *See also Gregor v. Kleiser,* 111 Ill.App.3d 333, 67 Ill.Dec. 38, 42, 443 N.E.2d 1162, 1166 (1982) (host of party liable for hiring bouncer who attacked plaintiff-guest without provocation).

The fact that Gates could have committed rape and murder in any variety of places is thus beside the point. By permitting his enlistment into the Army, the United States made it more likely that persons like Ms. Cuttle, who was invited onto and encouraged to frequent restricted Army installations, would encounter Gates under circumstances favorable to the commission of a crime.[12] The evidence thus supports the conclusion that the Army's enlistment of Gates placed persons such as Ms. Cuttle in unreasonable danger.[13]

---

**11.** An analogous circumstance is described in *DiCosala v. Kay,* 91 N.J. 159, 450 A.2d 508 (1982). In *DiCosala,* the plaintiff, a young boy, was accidentally shot while he was a social guest at a boy scout summer camp. He was shot by a camp counsellor with a privately owned gun kept on the premises by another camp counsellor. The camp operator was aware that this counsellor kept guns on the premises, but took no steps to prevent it. The New Jersey Supreme Court found sufficient evidence to support a claim that the camp operator was negligent in hiring the gun-owning counsellor, notwithstanding the fact that the victim was not a paying client of the camp but merely a social guest, and notwithstanding the fact that the gun-owning counsellor was not on duty at the time of the incident. The Court reasoned that the plaintiff was "exposed to an 'enhanced hazard' and fell within the 'zone of risk' created through defendants' employment of [the gun-owning counsellor]." *DiCosala,* 450 A.2d at 518.

Similar logic applies here. Even though Gates was not on duty at the time of the attack, and even though Ms. Cuttle was not dealing with Gates in Gates' employment capacity, Ms. Cuttle was nonetheless exposed to an enhanced risk because of Gates' employment as a soldier.

**12.** This case is distinguishable from *Carter v. Skokie Valley Detective Agency,* 256 Ill.App.3d 77, 195 Ill.Dec. 138, 628 N.E.2d 602 (1993). In *Carter,* a detective agency hired an individual with an extensive criminal record to act as a security guard. An employee of the gas station where the guard was assigned asked the guard, who was off duty, to drive her to another location. He agreed to provide her with a ride but, once she was in his car, he raped and murdered her. The court concluded that the attack was

not proximately caused by the detective agency's negligence because it occurred off-premises while the detective was off-duty. *Id.* 195 Ill.Dec. at 141–142, 628 N.E.2d at 605–606. That is, the attack did not occur "by reason of" the employment of the unfit security guard. *Id.* at 140, 628 N.E.2d at 604. In the instant case, by contrast, the attack took place on a restricted military facility, under conditions which could not have occurred but for Gates' enlistment in the Army. *Compare also Escobar v. Madsen Construction Co.,* 226 Ill.App.3d 92, 168 Ill.Dec. 238, 589 N.E.2d 638 (1992) (no proximate cause under negligent hiring theory where attack by co-worker took place before work and off premises); *Bates v. Doria,* 150 Ill.App.3d 1025, 104 Ill.Dec. 191, 502 N.E.2d 454 (1986) (no proximate cause under negligent hiring theory where deputy sheriff raped plaintiff while off-duty and out of uniform, and did not use departmental weapon in commission of crime).

**13.** The United States objects that even if Gates' rape conviction were known, there was no indication that he was likely to rape again. But this claim is belied by the United States' own representations in other contexts. In an *amicus curiae* brief submitted by the United States in opposition to a constitutional challenge to "Meagan's Law," a New Jersey law requiring convicted sex offenders to register with local police authorities, the United States noted that "A major Justice Department study of state prisoners released in one year showed that 7.7% of released rapists were rearrested for rape within three years, and 27.5% of released rapists were rearrested during that period for some kind of violent offense (murder, rape, robbery or assault). Released rapists

### 2. *Special Relationship*

■ The evidence showing the United States' breach of its duty to refrain from negligent hiring of violent felons is also sufficient to show a breach of its duty to Ms. Cuttle which arose by dint of her special relationship with the Army. The United States owed a duty to invitees, including Ms. Cuttle, to protect them from reasonably foreseeable criminal acts of others. Just as the existence of Gates' unexamined juvenile record made it reasonably foreseeable that he would be a unreasonably dangerous employee, it also made it reasonably foreseeable that he would create an unreasonable danger to the invitees of the United States on its Army bases around the world.[14]

### 3. *Voluntary Undertaking*

■ Finally, I find that there is sufficient evidence to support a finding that the United States breached its duty with respect to its voluntary undertaking to screen convicted felons from the Army. The United States, through the Army Inspector General, has admitted that eight different soldiers involved in the enlistment of Private Gates failed to follow Army regulations, and that had any one of them complied with regulations, Gates' ineligibility for enlistment would have been discovered. Thus, the United States clearly breached its duty, voluntarily undertaken, to screen convicted felons from the Army.

■ The evidence also supports a conclusion that this failure proximately caused Ms. Cuttle's death. As explained above, it was reasonably foreseeable that a convicted rapist and multiple felon would commit another crime of violence against a member of the military community were he permitted to enlist in the Army. By failing to properly screen Private Gates, as it had voluntarily undertaken to do, the Army made it reasonably foreseeable that someone in Ms. Cuttle's position would be Gates' next victim.

## IV. *CONCLUSION*

For the foregoing reasons, the United States' motion for summary judgment is **DENIED.**

**SO ORDERED.**

## *ORDER*

For the reasons set forth in the accompanying Memorandum, the United States' motion for summary judgment [docket entry # 45] is **DENIED.**

SO ORDERED.

were 10.5 times more likely to be rearrested for rape than were other released prisoners." (Brief of the United States as *Amicus Curiae* in *Artway v. Attorney General,* 83 F.3d 594 (3rd Cir.1996) at 6–7).

Moreover, apart from statistics, the facts in this case make it particularly apparent that Gates was a high risk for future criminal activity. His first rape, as a juvenile, was committed during a burglary. Subsequently, Gates was convicted of an additional burglary, and later, for unlawful use of a weapon. His most recent conviction was less than a year prior to his enlistment, and he was still on probation when he enlisted. Gates' record makes it clear that his rape conviction was not an isolated incident, but was part of a pattern of violent, felonious behavior by which he posed a danger to others, and which he showed no sign of being able to control. (Indeed, after he was arrested for Ms. Cuttle's murder, Gates subsequently admitted to having committed a third, previously undisclosed, rape).

14. The United States argues that Gates was being trained as an armor crewman, and that this fact somehow negates the foreseeability that Gates would be able to commit rape against a woman, since he would not be working directly with female soldiers. The very facts of this case belie that claim. Notwithstanding his specialty, Gates was stationed at Conn Barracks, an Army residential facility at which both men and women were continuously present.